THE STATE v. FITZGERALD, *Appellant.*

Division Two, November 19, 1895.

1. **Criminal Practice**: MURDER: EVIDENCE. On a trial for murder it appeared that after the inquest defendant made and signed a written statement to a detective. Defendant, before the taking of the testimony was begun, filed a motion to require the state to produce the statement in court on the ground that it was necessary and material to his defense. *Held,* in the absence of any showing why it was so necessary, the motion was rightly overruled.

2. ———: ———. Where the trial court's attention is not called to its alleged error in overruling a demurrer to the state's evidence, such action will not be reviewed on appeal.

State v. Fitzgerald.

3. ———: ———: THREATS. Evidence that a short time before the homicide defendant stated that he intended to kill someone and then to kill himself is admissible against the objection of its being too vague and indefinite.

4. ———: ———: EVIDENCE. Soon after the homicide defendant appeared at the police station with a revolver, and an officer testified that four of the chambers contained empty shells. *Held,* that it was competent to admit evidence that the witness heard a report of firearms, four in number, about the time and in the direction of the place where deceased was killed.

5. ———: ———: RECALLING WITNESS. It is within the discretion of the trial court to permit the state to recall a witness who has already testified.

6. ———: ———: EVIDENCE. A witness was permitted to describe the bullet holes in the ceiling of the porch at the place of the accident, defendant's cap and the caliber of his pistol; *held,* competent.

7. ———: ———: REMARKS OF PROSECUTING ATTORNEY. A conviction of murder will not be reversed because the prosecuting attorney improperly said that a certain cap produced on the trial would not "speak to the supreme court if the case ever gets there."

8. ———: ———: EVIDENCE: HARMLESS ERROR. Improper rulings on the evidence, not prejudicial to the defendant, will not afford a ground for reversal of the judgment.

9. ———: ———: THREATS TO COMMIT SUICIDE. Evidence of threats by deceased to commit suicide unaccompanied by any attempt to carry them into execution is inadmissible unless they are dying declarations or constitute a part of the *res gestae.*

10. ———: ———: CARRYING PISTOL. Evidence that deceased was in the habit of carrying a pistol is not admissible on a trial for murder.

11. Criminal Law: MURDER IN SECOND DEGREE. Where one shoots and kills another with a deadly weapon, and nothing more appears, the law presumes the offense to be murder in the second degree.

12. Criminal Practice: MURDER IN SECOND DEGREE: EVIDENCE. Defendant, on a trial for murder, claimed that deceased shot him and then committed suicide. There was testimony to the effect that on the evening preceding the homicide defendant said he intended to kill somebody and then kill himself, which evidence defendant denied. *Held,* the evidence authorized an instruction on murder in the first degree.

13. ———: ———: INSTRUCTIONS. Where defendant is convicted of murder in the first degree he is not prejudiced by an instruction on murder in the second degree.

14. ——: MANSLAUGHTER. The evidence in this case is *held* not to authorize instructions on manslaughter.

15. ——: IMPROPER REMARKS OF COUNSEL. Where remarks of counsel are checked by the court and withdrawn the appellant is not prejudiced.

16. ——: READING FROM LAW BOOKS TO JURY. The trial court can refuse to permit counsel to read to the jury from legal treatises.

*Appeal from St. Louis Criminal Court.*—HON. HENRY L. EDMUNDS, Judge.

AFFIRMED.

*McDonald & Howe* for appellant.

(1) The court erred in refusing to sustain defendant's motion praying the production in court of the written statement made by defendant at the time of his arrest. (2) The court erred in admitting testimony of the witnesses Scheibe and Behland for the state, relating to the alleged statements of defendant prior to the shooting. (3) The court erred in admitting the testimony of Charles Vincent relative to his hearing reports, such evidence amounting merely to the opinion of the witness. (4) It was error to allow the witness Albert Naessens to return to the stand after having testified, and after he had talked with the other witnesses and the attorneys for the state, for the purpose of changing his testimony. (5) It was error to allow witness Sergeant O'Donnell to give his opinion about the cap and the course of the bullets and the bullet holes in the ceiling. (6) It was error for the circuit attorney to refer to the supreme court passing upon the case, and to say in the presence of the jury while examining witness O'Donnell about the cap, "This cap won't speak to the supreme court if the case ever gets there." *State v. Kring*, 64 Mo. 591. (7) The court erred in not sustaining defendant's demurrer to the state's evidence.

(8) The court erred in allowing the circuit attorney to question the witness Mrs. Albintz as to whether she had not previously told Sergeant O'Donnell that she had taken a pistol away from defendant some time prior to the killing. (9) The court erred in refusing to allow defendant to introduce the written statement made by him to detective Desmond or to interrogate the witness in relation thereto. (10) There was error in the refusal to allow defendant to introduce testimony of witnesses Mrs. Guion and Mrs. Montgomery relative to deceased making threats to commit suicide and the reasons therefor. *Com. v. Trefethen*, 31 N. E. Rep. 961; *State v. Ludwig*, 70 Mo. 412; *Pearson v. State*, 16 S. W. Rep. (Tenn.) 726; *Boyd v. State* (14 Lea), 82 Tenn. 161; *Blackburn v. State*, 23 Ohio St. 146. (11) The court erred in commenting upon defendant's evidence to the effect that, "The court has grave doubts as to the admission of the testimony offered as to threats by deceased to commit suicide, but has allowed that to go in,"thereby discrediting and practically destroying the force and value of defendant's entire testimony. *Travelers' Ins. Co. v. Sheppard*, 85 Ga. 751; *Persons v. State*, 16 S. W. Rep. 728; *State v. Findley*, 101 Mo. 217. (12) The court erred in refusing to permit defendant to introduce the testimony of witness John Stover relative to deceased carrying a pistol. (13) The court erred in permitting the circuit attorney to examine defendant about matters not referred to in his examination in chief. *State v. Graves*, 92 Mo. 510; *State v. Chamberlain*, 89 Mo. 129; *State v. Elmer*, 115 Mo. 401; *State v. Patterson*, 88 Mo. 88; *State v. McLaughlin*, 76 Mo. 320. (14) The court erred in its instructions to the jury as to murder in the first and second degrees. *State v. Jones*, 20 Mo. 64; *State v. Ellis*, 74 Mo. 219; *State v. Nueslein*, 25 Mo. 111; *State v. Dunn*, 18 Mo. 423. (15) The court erred in not

instructing the jury as to manslaughter. *State v. Ludwig*, 70 Mo. 414; R. S. 1889, sec. 3466. (16) It was error for the circuit attorney to state in his argument that: "Nobody knows what was troubling the defendant, except Anna Naessens, and she is dead and can't tell it, and James Fitzgerald and his counsel and they won't tell it." *State v. Mahley*, 68 Mo. 315; *State v. Graves*, 95 Mo. 315; *State v. Moxley*, 102 Mo. 374; *Dawson v. State*, 24 S. W. Rep. 414; *Nun v. People*, 123 Ill. 333; *People v. Evans*, 72 Mich. 367; *State v. Elmer*, 115 Mo. 403. No apology by the counsel nor charge by the court could be deemed to have certainly averted the consequences which might naturally result or have cured the error. *State v. Ahern*, 54 Minn. 195. (17) The court erred in refusing to permit the defendant's counsel to illustrate his argument by reference to well known cases similar to the one under discussion, or to use a newspaper article or passages from textbooks by way of illustration. *Palmer v. People*, 28 N. E. Rep. (Ind.) 130; *Newman v. Com.*, 5 Cent. Rep. (Pa.) 497; 2 Encyclopedia of Pleading and Practice, 741; *Ins. Co. v. Cheever*, 36 Ohio St. 209. (18) It was radical error for the circuit attorney to insist upon the jury taking with them to their rooms all the articles of evidence introduced in the case. (19) The court should have sustained defendant's motion for a new trial.

*R. F. Walker*, attorney general, and *C. O. Bishop* for the state.

(1) It was urged in the argument upon the motion for new trial in the court below that there should have been an instruction for manslaughter in the first degree, upon the theory of "assisting at a self-murder;" but there was no evidence upon which to

base such an instruction. *State v. Avery*, 113 Mo. 501; *State v. Punshon*, 124 Mo. 448. (2) There was no error committed in refusing to compel the state to produce the written statement of appellant made to the police department several days after the homicide. *First.* It was a self-serving statement, and, therefore, wholly incompetent as evidence for the defense. *Second.* It was unreasonable and absurd to claim that appellant "could not safely or fully make his defense" without the production in court of his own voluntary statement regarding the homicide made several days after the killing. *Third.* The statement· was eventually produced before the jury and appellant had the full benefit of it. *Fourth.* The point is not preserved in the motion for new trial. *State v. Alred*, 115 Mo. 473; *State v. Gilmore*, 110 Mo. 1; *State v. Noeninger*, 108 Mo. 166. (3) The testimony of Scheibe and Behland as to appellant's threats of killing "someone" and himself afterward, made a few hours before the homicide and upon the same premises, was perfectly competent, even though the threats were vague and indefinite as to who the "someone" was. *State v. Guy*, 69 Mo. 430. The principle upon which such testimony is competent is fully discussed and· doctrine stated in *State v. Crawford*, 99 Mo. 74. (4) The testimony of Vincent as to hearing the reports of discharged firearms, four in number, at the time and place where the shooting occurred, was competent in every view of the case. Hearing the shots fired was a part of the *res gestae.* Moreover, there is no suggestion in the objection as to why the testimony should not have been admitted. Merely saying that it was "incompetent and immaterial" is not enough. The trial court has the right to know the specific ground upon which objection is made to testimony. *State v. Adams*, 108 Mo. 208; *State v. Kennade*, 121 Mo. 405. (5) The

exception to the court's overruling appellant's demurrer to the evidence is not preserved in the motion for new trial. *State v. Harvey*, 105 Mo. 316; *State v. Mitchell*, 98 Mo. 657; *State v. Reed*, 89 Mo. 168. A case should not be taken away from the jury if there is any evidence to sustain the issues. (6) The court did not err in refusing to permit Wm. Babelon to testify that she would not believe witness Scheibe under oath. *State v. Rush*, 77 Mo. 519. (7) The state is not bound by the declarations of deceased when not a part of the *res gestae*, and unaccompanied by any act of deceased which they might characterize or explain, but are only mere naked declarations offered as original evidence. *State v. Punshon*, 124 Mo. 448; *Seibert v. People*, 143 Ill. 571. (8) The cross-examination of the appellant was strictly in line with the ruling of this court in *State v. Avery*, 113 Mo. 475. (9) The remark of Mr. Zachritz as to what the appellant did not testify about when he was upon the stand was promptly checked by the court, the remark withdrawn, and the jury told they must not consider it. Thus the error, if any, was cured. *State v. Graves*, 95 Mo. 510 (516–517). (10) It is a matter resting in the discretion of the court whether counsel shall be permitted to read law books to the jury. *State v. Klinger*, 46 Mo. 226; *Williams v. Railroad*, 126 N. Y. 104.

BURGESS, J.—From a conviction of murder in the first degree by shooting Annie Naessens to death with a pistol the defendant has appealed to this court. The murder is alleged to have occurred on the twenty-ninth day of November, 1893, in the city of St. Louis, Missouri, where the trial was had.

Deceased at the time of her death was about eighteen years of age and had been engaged as a domestic in the family of one Albintz, a saloon keeper

who was engaged in business at the southeast corner of Broadway and Quincy streets, in Carondelet in said city. Albintz with his family resided over the saloon, where deceased roomed. Defendant was a suitor of the girl, had been acquainted with her for about a year, called on her frequently at her home in the southeastern part of said city, and also at Albintz's while she was living there. They were engaged to be married.

On the day of the homicide defendant was not engaged in any employment and spent a greater part of the day and especially the evening in the saloon drinking, and in the evening seemed to be somewhat under the influence of intoxicants. A witness for the state by the name of Scheibe testified that during the evening defendant said to him, "Come on, Frank, let's have a drink," remarking at the time, "This may be the last drink you will have with me," and on being asked by the witness why, he replied, "Never mind why."

Another witness for the state, Joseph Behland, testified that during the same day he heard defendant say more than once that he was going to kill somebody and then kill himself.

Defendant was seen in the saloon about 9 o'clock that night, and about midnight, or shortly thereafter, four shots were heard, three in succession and another within a minute. About thirty minutes after the shots were heard, defendant appeared at the police station, holding in his hand a pistol. The blood was then flowing from the right side of his head and he was very much excited.

Sergant O'Donnell of the police force, who was in the station at the time, testified as follows:

"I asked him what was the matter and took the pistol from him. He said a man had shot his girl and then shot him, and he thought the girl was dead. I

asked him where this occurred, and he gave me the number of the premises. I put him in charge of the clerk and went up there as soon as possible to investigate. * * * I went around to the side of the house (Albintz's); the gate was open and as I went into the yard I heard someone moaning or groaning; located the sound as coming from up stairs. I went up and saw a woman lying at the head of the stairway; tried to arouse her, but could not; then went into the kitchen and called aloud, but could get no response. Then went for Dr. Reber and for another officer; we went back, took up the woman and carried her into the kitchen. Saw a large wound on the right side of her head; had her sent to the dispensary.

"I then went back to the station and asked the defendant what he wanted to shoot the girl for, and he said he didn't shoot her. I said, 'Yes, you shot her, she told us you did.' He said, 'Did she?' I said, 'Yes.' He answered, 'Well, if she said so, I suppose I must stand the consequences.' I examined his cap and found it very much powder-burned on the right side and around on the right side of his head corresponding. I charged him with attempting to shoot himself, and he denied it. Next morning officer O'Brien and I went up again to investigate by daylight; found two bullets imbedded in the ceiling of the second story porch almost directly over where the woman's body had been lying. The ceiling was made of half-finished boards; one bullet was directly behind a post and the other about fourteen inches to one side.

"The pistol taken from defendant had one full cartridge, four empty shells and one open chamber. It was a 32-calibre, of the American bull-dog pattern. I asked him about the shooting, and he said: 'A man shot my girl and then shot me;' that the man was standing out very near the center of the yard, or

a little close to the alley fence, and shot from there.   I asked him if he knew the man, he said he did not.   I asked for a description, and he said he was a rather stout built man, not quite so tall as himself, and when he did the shooting he ran through the gate.   He told me the man fired three shots; that he and his girl were standing upon the porch at the landing of the stairway. We went together to the place and he showed me as nearly as he could, in the back yard, where the man stood as he did the shooting, which would be about forty feet from the steps leading up to the porch.   He said the girl fell and he caught her in his arms and laid her upon the porch, ran down the stair and began shooting at the man as he was going out of the gate, firing two or three shots; followed him about a block and a half, but the man outran him and got away.

"I saw the wound in the girl's head; it was about the size of a quarter dollar, and blackened, the flesh powder-burned, and the blood and brains oozing out. She was lying at the head of the stairway, her head close to the rear wall of the building and her feet pointing in the direction of the stairs. * * * I asked defendant where he had his revolver, and he said, in his coat pocket.   I asked his object in carrying it in his coat pocket, and he said he didn't know very well, but there was where he had it. * * * I did not move the body until the doctor came.   The girl was unconscious when I reached her and never spoke. * * * I asked the defendant if he could identify the man he charged with the shooting in case he was arrested, and he said he thought he could; then asked him if he had had any trouble with anyone prior to the shooting that night, and he said he had had some trouble with a man named James Burke. I asked if Burke corresponded in size, etc., with the man he saw in the yard, and he said he did.   I found Burke

and brought him to the station, but defendant failed in any way to connect him with the shooting."

It was shown that the bullet holes found in the ceiling of the porch could not have been made by a person firing a pistol from the yard at the place designated by defendant, and that their direction was in a direct course from the place where the girl was found lying after having been shot. She was unconscious at the time she was found, and remained in that condition up to the time of her death, which occurred at 11:30 P. M. of that day at the hospital, to which she had been removed at 4:45 that morning. When she was received at the hospital, she was found, on examination, to have received a gunshot wound on the right side of the head and the part powder-burned down to the bone. The autopsy disclosed the bullet entered at the external angle of the eye, and ranged inward and slightly upward, passing through the brain, shattering the skull, and was found lodged under the skin on the left side of the head. Death was the necessary result of the wound.

The testimony on the part of the defense tended to show, substantially, as follows: That defendant had borne a good character previous to the homicide; that the state's witness, Scheibe, was of bad character, and that his testimony as to what occurred in Albintz's saloon, on the evening before the shooting, was not true; that he had had a difficulty with defendant shortly before, and had threatened, after that, to "get even" with him; that deceased was unhappy in her domestic relations, and for a long time before her death was down-hearted and despondent, and talked of being weary of life and wished she was dead; that she had a revolver in her room at Albintz's some time before her death, and that a pistol, which defendant had been accustomed to have at home, had been missing some three or four months.

VOL. 130 mo—27

Defendant, testifying in his own behalf, stated that he had known deceased about a year before her death, had been keeping company with her, and was in her company on the night of the homicide from 9 to 12 o'clock; they had spent the evening in the kitchen, then went out upon the porch together and stood at the head of the stairs for fifteen or twenty minutes. She began talking about their wedding, but he "joked it off;" she then talked of her father's harsh treatment of her at home, and while so talking he started to go, as it was late; he stepped down upon the first step, when she caught him by the arms, reaching over the railing, saying, "Wait a few minutes, I want to tell you something." He stepped back again upon the porch, and she remarked several times, "O, I wish I was dead!" to which he replied, "Why don't you die?" She put her arms around him and said, "There is only one thing that will stop me—that is you; I don't want to die alone; will you die with me?" He laughed at that and said, "Yes." Then she kissed him and bade him good-bye, and he stepped away from her, when she said, "if I don't kill you, don't tell anybody about it," and then fired a shot at him; he was dazed and staggered around a little, and when he recovered he saw her lying on the porch, and right alongside of her was the pistol; he caught hold of the banister with his left hand, reached over and picked up the revolver with his right, and the thought then struck him to go to the police station, as that was the place to report such things. He had given her the revolver some two or three weeks before to carry when she went home, as she had to travel over a mile through a tough neighborhood—"a nigger settlement."

He went to the station, being excited, and hardly knowing what he was doing. He made the statement to the officer, about a man in the yard shooting,

in order to save the girl, as he didn't want the disgrace of it on her shoulders; he didn't know at the time how badly she was hurt, but knew she was not dead when he left her. He was engaged to her, and the time set for the marriage was November 10, but it had to be postponed on account of his being out of work; this made her despondent, for she would sooner be dead than have to go back home. He had had a difficulty with state's witness, Scheibe, a few days before the homicide, over a game of cards. He denied having made the statements attributed to him by Scheibe on the evening before.

Upon cross-examination he stated that he did not see the pistol at all before the shooting; heard only one report; did not speak to the girl after the shooting, nor say a word; did not look to see how badly she was hurt, though he saw the blood; did not call for help, although the door leading into the rooms where the Albintz family lived was open; made no outcry, gave no alarm, left the girl alone and took the nearest way to the police station, where he answered the questions put to him in such a way as not to implicate her, for he didn't know what would become of her if he should tell the truth about it; he knew when he left the house that she was not dead, for he could hear her breathing. He admitted having made a statement to the chief detective officer after the inquest was over and he was held for the homicide, which was reduced to writing and signed by him. The statement was read in evidence by the circuit attorney in connection with defendant's testimony.

The instructions given in the cause are as follows:

"The defendant stands charged by the indictment with murder in the first degree, and pleads not guilty, and the court instructs you as follows:

"Murder in the first degree is the killing of a human being, willfully, deliberately, premeditatedly, and with malice aforethought.

"Murder in the second degree is the killing of a human being willfully, premeditatedly, and with malice aforethought (but without deliberation).

"Under the evidence in the cause you will convict the defendant of murder in the first or second degree, or you will acquit him.

"As used in the instructions, the word 'willfully' means intentionally and not by accident.

"'Premeditatedly' means thought of beforehand for any length of time, however short.

"The term 'malice' as used in the indictment does not mean in the legal sense mere spite, ill will, hatred or dislike, as it is ordinarily understood, but it means that condition of mind which prompts one person to take the life of another without just cause, or excuse, and signifies a state of disposition which shows a heart regardless of social duty and fatally bent on mischief.

"'Malice aforethought' means that the act was done with malice and premeditation.

"'Deliberately' dees not mean brooded over, considered or reflected upon for a week, a day, or an hour, but it means an intent to kill executed by one in a cool state of the blood in furtherance of a formed design to gratify a feeling of revenge, or to accomplish some other unlawful purpose, and not under the influence of a violent passion suddenly aroused by a real or supposed grievance suffered at the time.

'If you believe and find from the evidence in the cause that the defendant at the city of St. Louis, state of Missouri, on or about the twenty-fourth day of November, 1893, willfully, deliberately, premeditatedly and with malice aforethought shot with a pistol and wounded Annie Naessens upon the head and body of

her the said Annie Naessens, and further find that within a year and a day after said shooting, and during the month of November, 1893, the said Annie Naessens died from the effects of such shooting and wounding done by the defendant as aforesaid, at the city of St. Louis, you will find the defendant guilty of murder in the first degree, and unless you so find you will acquit the defendant of murder in the first degree.

"He who *willfully*, that is, intentionally, uses upon another at some vital point a deadly weapon, such as a pistol, must, in the absence of qualifying facts, be presumed to know that the effect is likely to be death, and, knowing this, must be presumed to intend death, which is the probable consequence of such an act; and if such deadly weapon is used without just cause or provocation he must be presumed to do it wickedly and from a bad heart. If, therefore, you believe and find from the evidence in the cause that the defendant killed Annie Naessens by shooting her in a vital part with a manifest design to use such pistol upon her and with sufficient time to deliberate and fully form the conscious purpose to kill, then such killing is murder in the first degree.

"And while it devolves upon the state to prove the willfulness, deliberation, premeditation and malice aforethought, all of which are necessary to constitute murder in the first degree, yet these need not be proved by direct evidence, but may be deduced from all the facts and circumstances attending the killing, and if you can satisfactorily and reasonably infer their existence from all the evidence, you will be warranted in finding the defendant guilty of murder in the first degree.

"If you believe and find, from the evidence in the cause, that the defendant, at the city of St. Louis, state of Missouri, on or about the twenty-fourth day of No-

vember, 1893, willfully, premeditatedly, and with malice aforethought, but not deliberately, as hereinbefore defined, shot with a pistol and wounded Annie Naessens, and further find that within a year and a day after said shooting, and during the month of November, 1893, the said Annie Naessens died from the effects of such shooting and wounding done by the defendant as aforesaid at the city of St. Louis, you will find the defendant guilty of murder in the second degree; and unless you so find you should acquit him of murder in the second degree.

"If you further find, from the evidence in the cause, that defendant intentionally killed deceased by shooting her with a pistol, and that such pistol was a deadly weapon, then the law presumes that the killing was murder in the second degree, in the absence of proof to the contrary; and it devolves upon the defendant to adduce evidence to meet or repel that presumption, unless such presumption is repelled by the evidence introduced on the part of the state.

"The court instructs you that positive and direct evidence of the constituent elements of murder, as defined in these instructions, is not required; they may be proved by circumstantial evidence alone.

"The prosecution seeks a conviction in this case upon circumstantial evidence alone. The court, therefore, instructs you that you can not convict the defendant unless the state has proven his guilt from the evidence beyond a reasonable doubt by facts and circumstances, all of which are consistent with each other and with his guilt, and absolutely inconsistent with any reasonable theory of innocence.

"If you convict the defendant of murder in the first degree, you will simply so state in your verdict.

"If you convict the defendant of murder in the second degree, you will assess his punishment at impris-

onment in the penitentiary any number of years, not less than ten years.

"The court instructs the jury that if they believe and find from the evidence in the case that the deceased committed suicide, then the jury will acquit the defendant; and the court instructs you that in considering the question as to whether or not the deceased did commit suicide, they should take into consideration all the circumstances surrounding the deceased, including any previous statements or assertions on her part that she would commit suicide, or that she wished she was dead, or that she was tired of living, if the jury find any such statements were made; and should also consider all the physical facts, such as the character of the wounds inflicted, and as to whether or not they could have been inflicted by the deceased, together with the course of the bullets in said wounds, and the course of the bullets in the ceiling, together with all the attending circumstances; and the court instructs the jury that it is not necessary that the evidence touching the theory of suicide should preponderate in favor of that theory, but it is sufficient if, after considering all the circumstances given in evidence touching the theory of suicide, together with all the other facts, the jury have a reasonable doubt of the defendant's guilt. The law presumes him absolutely innocent, and this presumption continues until it has been overcome by evidence which establishes his guilt to your satisfaction and beyond a reasonable doubt; and the burden of proving his guilt rests with the state.

"The defendant is a competent witness in his own behalf, but the fact that he is a witness testifying in his own behalf, and the interest he has at stake in this case, may be considered by the jury in determining the credibility of his testimony.

"The previous good character of the defendant, if established, is a fact in this case which the jury ought to consider in passing upon his guilt or innocence of this charge, for the law presumes that a man whose character is good is less likely to commit a crime than one whose character is not good.

"But if all the evidence in the case, including that given touching the previous good character of the defendant, shows him to be guilty, then his previous good character can not justify or excuse the offense.

"The jury are the exclusive judges of the credibility of the witnesses. With that the court has nothing to do; and if you believe and find from the evidence that any witness has willfully testified falsely to any material fact in the case, you are at liberty to disregard the whole or any portion of such witness' testimony.

"If, however, this presumption has been overcome by the evidence, and the guilt of the defendant established to a moral certainty and beyond a reasonable doubt, your duty is to convict. If of his guilt you are not convinced beyond a reasonable doubt, your duty is to acquit. But to justify an acquittal on the ground of doubt alone, it should be reasonable and substantial, and not a mere guess or conjecture of the possibility of innocence."

The first point relied upon by defendant for a reversal of the judgment is the action of the court in refusing to sustain his motion praying the production in court of the written statement made and signed by him to the chief detective officer William Desmond after the inquest was over, and he was being held for the homicide, and which was at the time of the trial in the possession of the prosecution. The motion was filed before the taking of testimony was begun. No reason has been assigned wherein there was error in overruling this motion. It is true that it is said the

statement was necessary and material to the defendant in the preparation and proper presentation of his defense, but as to wherein or how material we are left to conjecture.

Nor has it been made apparent to us why it was necessary, for the purpose claimed by defendant.

Moreover, it was the evidence of the state, and if defendant's contention be correct, he could, for like reason and upon the same principle, have asked the court to require the state to produce its witnesses before his counsel for their examination in regard to their knowledge of the case, that he might thereby be better prepared to make his defense, something for which no lawyer would contend. At most, it was a matter resting in the discretion of the court, and it did not act unwisely, in overruling the motion.

At the conclusion of the state's case counsel for defendant interposed a demurrer to the evidence which was overruled, and in this it is contended error was committed. The evidence on the part of the state was ample to take the case to the jury, and even though it were not, as the ruling of the court on the demurrer was not called to its attention in the motion for a new trial, it is not the subject of review here. All such errors must be called to the attention of the trial court in a motion for a new trial, otherwise they will not be noticed here. *State v. Alred*, 115 Mo. 471; *State v. Harvey*, 105 Mo. 316; *State v. Mitchell*, 98 Mo. 657; *State v. Reed*, 89 Mo. 168.

The testimony of the witnesses Scheibe and Behland, as to the statements of defendant made in Albintz's saloon the evening before the killing, to the effect that he intended to kill someone and then kill himself, was clearly admissible, although vague and indefinite as to the intended victim. That was a question for the jury. Persons who make threats of violence against others

do not always give the names of those whom they intend to assault, which, under such circumstances, can only be shown by facts and circumstances. In *State v. Crawford*, 99 Mo. 74, it was said evidence of "covert, indirect, or vague threats, more properly designated as 'verbal intimations' and as 'declarations of intention,' was all competent evidence, and it is the constant practice to admit such evidence in courts of justice." Evidence of a similar character was held to have been properly admitted in *State v. Guy*, 69 Mo. 430.

There was no error committed in admitting the testimony of the witness Vincent as to hearing the reports of firearms, four in number, about the time, and in the direction of the place where deceased met her death. It was simply a circumstance tending to show defendant's guilt, and corroborative of the testimony of the police officer O'Donnell, as to the number of empty chambers in, and the condition of, the pistol when defendant surrendered it to him.

Nor do we think there was error in permitting the prosecution to recall the witness Albert Naessens, after he had testified on the trial. This was a matter resting altogether in the discretion of the court.

It is contended that error was committed in allowing witness Sergeant O'Donnell to give his opinion about defendant's cap, and the course of the bullets and the bullet holes in the ceiling of the porch just above where deceased had been found lying. The witness only described the bullet holes, and the condition of defendant's cap as they appeared within a few hours after the homicide, which was entirely legitimate. Nor was there any impropriety in permitting the witness to state that the pistol taken by him from defendant was of 32 calibre.

While the remark of the circuit attorney with respect to the cap, in saying, "The cap wont speak to

the supreme court if the case ever gets there," was out of place, the judgment should not be reversed for that cause alone.

Mrs. Albintz, a witness for defendant, testified that deceased had been living at her house about three months at the time she was shot; that, about two weeks after she came there, she saw a pistol in a box in her room and told her to take it away which she thought she did, as she never saw it afterward.   On her cross-examination by the state, she was asked, over defendant's objection, if she had not told Sergeant O'Donnell that she and her husband had taken a pistol away from defendant some time before because she thought defendant wanted to kill deceased.   The witness answered in the negative, and Sergeant O'Donnell was not called to the witness stand for the purpose of contradicting her. This is characterized by counsel for defendant in their brief as "the rankest kind of testimony, even had it been true."

The question was manifestly improper, but as it was answered in the negative and no effort was made to contradict the witness, her answer must have been taken as true.   How, then, could the rights of the defendant have been prejudiced by such evidence? The jury would certainly have preferred to believe the witness than to have inferred from the question that she did make the statement.   While an improper question should never be propounded to a witness, especially in a criminal case, for the purpose of insinuating that a certain fact prejudicial to the defendant exists, when in fact it does not, yet illegal questions are often asked in good faith, and from the best of motive, and we are not prepared to say that such was not the case in this instance.   We are not, therefore, inclined to hold that the question was hurtful to defendant.

Another point is, that the court erred in refusing

to allow defendant to introduce in his own behalf the written statement made by him to detective Desmond, some days after the homicide, or to interrogate the witness in relation thereto. The statement had not then been introduced in evidence by the state and it was not permissible for defendant to prove his own statements in his behalf, unless, they were a part of a conversation or statement introduced by the state, in which event he was entitled to have all that was said in the conversation or written statement go to the jury, if he so desired. The statement was read, however, by the state in rebuttal, when defendant exercised the right to testify all about it, and everything in regard thereto. He was entitled to no right, with respect to the statement, of which he was deprived.

Another contention is that the court erred in refusing to allow defendant to introduce evidence of threats by deceased to commit suicide, and the reasons given by her therefor. An examination of the record does not support this contention, but does show that such evidence was introduced. In confirmation of what has been said in this regard the record also discloses, that the court when ruling upon the admissibility of such testimony remarked, that, "the court has grave doubts as to the admission of the testimony offered as to threats by deceased to commit suicide, but has allowed that to go to the jury," and that defendant excepted to such remarks. Furthermore, the court, in order that defendant might have the full benefit of such evidence, instructed the jury "that in considering the question as to whether or not the deceased did commit suicide they should take into consideration all the circumstances surrounding the deceased including any previous statements or assertions on her part that she would commit suicide, or that she wished she was dead, or that she was tired of

living, if the jury find any such statements were made, etc." This would seem to be a sufficient answer to this contention.

But suppose, as asserted by counsel for defendant, the evidence of threats to commit suicide had been excluded, would it have been error? Upon this question the authorities are not uniform.

In a recent case in Massachusetts, *Commonwealth v. Trefethen*, 157 Mass. 180, (31 N. E. Rep. 961), in an opinion delivered October 20, 1892, it was held (overruling a former decision of that court, *Com. v. Felch*, 132 Mass. 22), that the declaration of an unmarried woman, pregnant with child, stating an intention to commit suicide, though made the day before her death, was not so remote as to be rendered inadmissible on the trial of one accused of her murder, but such intention might well be considered as continuing to the time of her death. As authority in support of the ruling, the court refers to several adjudications which will now be considered. The first is, *Insurance Co. v. Hillmon*, 145 U. S. 285.

The difference between the case last cited and the one at bar is as "broad as a gulf." That was a suit on contracts, policies of life insurance, where the admissions or statements by either party, or their privies, with respect of the subject-matter of controversy, might be shown by the adverse party. This rule is of universal application in such cases.

That such is not the rule in criminal cases I shall endeavor to show.

*Hunter v. State*, 11 Vroom (40 N. J. L.), 495, is referred to in the case last cited as supporting the rule announced in that case. The *Hunter* case was a prosecution for murder, and over the objections of defendant the state was permitted to prove declarations of the deceased made in the forenoon of the day pre-

ceding his murder, not in the presence of defendant, that he was going to Camden with the defendant that night, and also to read in evidence a letter written by deceased to his wife on the evening of the same day in which he stated: "I will not be home much before 9 o'clock. Am going over to Camden again with Mr. Hunter, on business connected with the Davis matter." The declaration was made, and the letter written in Philadelphia, while the murder was committed in Camden, New Jersey. The evidence was held to have been properly admitted upon the ground, that the statements were the "natural and inartificial concomitants of a probable act, which itself was a part of the *res gestae*."

*Puryear v. Commonwealth*, 1 S. E. Rep. (Va.) 512, is also referred to. That was a case of wife murder, and the charge was made by the dying woman that her husband had killed her with poison mixed with whiskey, and administered to her a short time before her death. On the trial of her husband for murder the court held the evidence admissible upon three grounds: *First*, it was a charge made by her against her husband in his presence, and not denied by him; *secondly*, it was a circumstance immediately and closely linked to the alleged homicide, and was part of the *res gestae; thirdly*, as dying declarations. The woman was in the agonies of death which quickly followed, and there is no question but they were properly admitted.

*Blackburn v. State*, 23 Ohio St. 146, is another case referred to. In that case defendant was indicted for murder by poisoning to death one Mary Jane Lovell, and during the trial, for the purpose of showing that the deceased had committed suicide, defendant called a witness with whom she had resided six years prior to her death, and offered to prove by her that the deceased, while living with her, was of a melancholy dis-

position of mind, and was predisposed to, and had threatened to commit suicide. The court rejected the evidence, and the defendant excepted. The supreme court, in disposing of the question, did not pass upon the admissibility of the *threats* of deceased to commit suicide, but simply ruled that the evidence of her predisposition to commit suicide should have been admitted, and because of its rejection reversed the judgment. That case can not control here.

In *Boyd v. State*, 14 Lea, 161, the Ohio case was followed and approved.

In *Goersen v. Commonwealth*, 99 Pa. St. 388, the question now under consideration was not passed on.

While such evidence of threats made by the deceased to commit suicide was introduced in *Reg. v. Jessop*, 16 Cox Crim. Cases, 204, no point was made on it, nor was the question passed upon by the court.

We will now advert to a number of authorities which hold to a contrary rule.

Mr. Bishop, in his work on Criminal Procedure [3 Ed.] (vol. 2, sec. 623), after stating that the deceased is not a party to the prosecution and his utterances are hearsay, says: "The declarations of the deceased, as of any other third person, when not of the *res gestae*, or dying declarations, or communicated to the defendant so as possibly to influence his conduct, are excluded by rules which have been supposed to promote justice on the whole; at all events, which have become parts of the common law, not within the discretion of the courts to set aside. Hence they are not admissible."

In *Siebert v. People*, 143 Ill. 571, the wife of the deceased and the defendant, her paramour, were on trial for the murder of her husband by administering to him poison, and it was proposed to prove declara-

tions of the deceased made at different times within a year before his death, and prior to his last sickness, that he intended to take his own life, not accompanied by any act of his which they might explain, and it was held, in an able opinion by Mr. Justice CRAIG, that being mere hearsay they were not admissible on the part of the defense. In course of the opinion in commenting on the case of *Commonwealth v. Trefethen*, *supra*, it is said: "In that case the court held that the declaration of an unmarried woman pregnant with child, declaring her intention to commit suicide, made the day before her death, was admissible on the trial of one accused of her murder. This decision, although rendered by a court of high standing, we do not regard in harmony with the current of authority, and we are not inclined to follow it. If a declaration of that character was accompanied with any act tending to show an intent to commit suicide, it might be admissible in connection with the act."

*Kennedy v. People*, 39 N. Y. 253, was a prosecution for homicide, and it was proposed to prove the declarations of the deceased tending to show that he had no money. The court said: "The question, whether the deceased had or had not money in his possession at the time of his death, was, no doubt, a material one, as will presently be considered, and it may have been material to show that the prisoner was aware that the deceased had money; but the declaration of the deceased, some weeks before the murder, was not competent evidence, that he had no money, it was no more evidence as against the people, or for the prisoner, than his declaration upon any other subject would have been. I know of no rule which makes the declarations of the deceased, forming no part of the *res gestae*, competent evidence, either for or against either party. It is in no analogy to dying declara-

tions, which are received, when made in view of approaching death, as having a sanction equivalent to testimony given under the solemnity of an oath before the court and jury.''

So in *State v. Dart*, 29 Conn. 153, on a trial for murder of an aged woman, the defense was that she was subject to fits, and had fallen in a pool of water and drowned, and in support of this theory proposed to prove her declarations, made a year before, that she was subject to fits, and had on several occasions fallen on her face while in a fit. The court in passing upon the question, observed: ''Hearsay evidence is not admissible merely because in the particular case no better can be had.''

In a case in New Hampshire (*State v. Wood*, 53 N. H. 484) in which the defendant was charged with murder by producing an abortion, it was shown on the trial that the deceased on leaving the office of another physician had made declarations which the defense proposed to prove. The court held the evidence inadmissible, and, in passing on the case, said: ''The evidence offered was the merest hearsay in the world. They were not dying declarations, nor were they connected with any fact that alone had any connection with the cause on trial. The case of *Patten v. Ferguson*, 18 N. H. 528, would seem to settle this question. The fact was of no importance, standing alone, and the declaration, standing alone, was incompetent. When they are united, the unimportant fact is used as a vehicle to introduce the incompetent declaration. * * * The theory that such a declaration can be valid and made competent by connecting it with a fact utterly immaterial to the cause, does not need authorities to refute it.''

A similar rule was announced in *Commonwealth v. Felch*, 132 Mass. 22, which was subsequently overruled by *Commonwealth v. Trefethen, supra*.

Our conclusion upon this question is, that evidence of threats by the deceased to commit suicide, unaccompanied as they were by any attempt at the time to carry them into execution, was inadmissible and should have been excluded. Such statements are only admissible in a criminal case when part of the *res gestæ*, or when they are admissible as dying declarations. This we think, not only supported by the decided weight of authority, but by reason as well. *State v. Punshon*, 124 Mo. 448.

What has been said applies with equal force to the action of the court in excluding the evidence of John Stover, that deceased was in the habit of carrying a pistol. That part of the opinion in *State v. Ludwig*, 70 Mo. 412, which seems to announce a different rule was unnecessary to a decision of that case, was mere *obiter*, and the case should be overruled.

The cross-examination of defendant was in line with the more recent rulings of this court as announced in *State v. Avery*, 113 Mo. 475, and *State v. Kennade*, 121 Mo. 405. There was no error committed in that regard.

The instructions are also criticised, but they seem to be in form often approved by this court, and, in so far as we have been able to discover, free from objection.

It is argued, however, with much earnestness that there was no evidence upon which to predicate an instruction for murder in the second degree and that the instruction upon that theory of the case should not have been given.

The law is well settled in this state that where it is shown that the accused shot and killed his victim with

a deadly weapon, and nothing more appears, then the law will presume the crime was murder in the second degree. *State v. Anderson*, 98 Mo. 461. If, then, the defendant shot and killed Annie Naessens and nothing more was shown than the killing, he was guilty of murder in the second degree. The evidence on the part of the state showed that on the evening preceding the night of the homicide he had said that he was going to kill somebody and then kill himself. This, however, was denied by him, and presented a question of fact for the determination of the jury, as to whether or not made, and, if so, was deceased the intended victim. The jury evidently disbelieved his story. In the absence of deliberation and a preconceived design to take the life of deceased, he was only guilty of murder in the second degree. Hence there was no error committed in instructing for murder in the second degree.

But, even if the facts did not justify such an instruction, which we by no means concede, as defendant was convicted of a higher grade of offense, murder in the first degree, he was in no manner prejudiced by reason thereof, and in no position to complain.

It is also contended by counsel for defendant that the court should have instructed for manslaughter in the first degree. In order to justify this contention the facts in proof must have shown, or tended to have shown, that defendant was guilty of manslaughter in the first degree as defined by our statute as follows:

"Section 3465. *Manslaughter in the first degree.* The killing of a human being, without a design to effect death, by the act, procurement or culpable negligence of another, while such other is engaged in the perpetration or attempt to perpetrate any crime or misdemeanor not amounting to a felony, in cases where such killing would be murder at the common law, shall be deemed manslaughter in the first degree.

"Section 3466.   *Manslaughter in the first degree.*
Every person deliberately assisting another in the com-
mission of self-murder shall be deemed guilty of man-
slaughter in the first degree."

It is quite clear that the facts in proof do not bring
the case within the meaning of manslaughter as de-
fined by the first section quoted, for the reason that it
does not appear "that the killing was done without a
design to effect death, nor that it was done while the
doer of the act was engaged in the perpetration, or
attempt to perpetrate, any crime or misdemeanor not
amounting to a felony." *State v. Emerich*, 87 Mo.
110; *State v. Downs*, 91 Mo. 19.   On the contrary the
evidence showed the killing to have been intentional,
whether done by the defendant or not.   Nor do the
facts bring it within section 3466, for the reason that
the evidence did not show that defendant assisted the
deceased in the commission of self-murder, but it did
show that she either committed suicide, or that he
shot and killed her, and the instructions covered both
of those theories.   The instructions covered every phase
of the case authorized by the evidence.

During the argument of the case to the jury one
of the counsel for the state remarked, "Nobody knows
what was troubling the defendant except Annie Naes-
sens, and she is dead and can't tell it, and James
Fitzgerald and his counsel and they won't tell it."
This was objected to by defendant at the time as being
improper.   The court thereupon checked the counsel,
the remark was withdrawn by him, and the jury told
by the court not to consider it.   While it must be con-
ceded that the remark was out of place, and should
not have been made, yet when it was withdrawn by
the counsel who made it, and the court directed the
jury not to consider it, it could not have been prejudi-

State v. Fitzgerald.

cial to the rights of defendant, and the judgment should not be reversed upon that ground alone.

A final contention is that the court erred in refusing to permit counsel for defendant to read during his argument before the jury, from Wharton on Homicide, wherein he treats of suicide. A similar question was before this court in *State v. Klinger*, 46 Mo. 224, and it was held that, "whether counsel will be allowed to read books to the jury is a matter resting within the discretion of the court." In *Williams v. Railroad*, 126 N. Y. 104, the court said: "It may be observed, however, that it is the function of the judge to instruct the jury upon the law, and where counsel undertake to read the law to the jury, the judge may properly interpose to prevent it." It thus seems clear that there was no error committed in this regard.

We have examined every objection taken to the judgment of the court below worthy of consideration, many of which are extremely technical. The issues involved in the case were all clearly and fairly presented to the jury. The defendant has no reason to complain; he had a fair and impartial trial before a jury of his own selection, who found that he willfully and deliberately murdered his victim without the slightest cause or provocation, and, under such circumstances, the law forbids our interference with their verdict. The judgment is affirmed. GANTT, P. J., and SHERWOOD, J., concur.