[Crim. No. 261. First Appellate District.—November 17, 1910.]

# THE PEOPLE, Respondent, v. JOHN WALTER WILSON, Appellant.

CRIMINAL LAW—MURDER—POISONING—DEFENSE OF SUICIDE—ERROR IN EVIDENCE.—Where the evidence upon a prosecution for murder by poisoning of the deceased showed that deceased had stomach trouble, and received a letter from a pretended physician inclosing two powders, with the statement that he had learned from a friend of his that he so suffered and inclosed a remedy therefor, on taking which he died from strychnine poisoning, and also consisted largely of expert evidence that the letter inclosing the poison was in defendant's handwriting, but the defense was that deceased committed suicide, and wrote the letter himself, it was prejudicial error to exclude any material evidence bearing upon and tending to sustain such defense.

ID.—POISON SELF-ADMINISTERED—DECEASED ON TRIAL AS TO SUICIDE—MATERIALITY OF EVIDENCE.—Where the deceased with his own hands administered the poison that caused his death, and the defense is that the deceased committed suicide, any evidence which tends to support such theory, or which tends to show that it may be true, is admissible. In such case, the deceased, as well as the defendant, is, in a certain sense, upon trial, and evidence of any acts, conduct or declarations of deceased tending to prove that he may have committed suicide is relevant and material.

ID.—CRUCIAL TEST AS TO SUICIDE—AUTHORSHIP OF "POISON" LETTER.—The crucial test as to whether or not the deceased committed suicide is presented by the question, Did he write the "poison" letter? Any evidence that would reasonably tend to prove that he wrote or may have written the "poison" letter was relevant and material to the issues involved in the case.

ID.—MODE OF WRITING BY DECEASED—MATERIAL EVIDENCE EXCLUDED—PREJUDICIAL ERROR.—Evidence was admissible to show that deceased had written letters to himself, that he was erratic, had boasted of doing several kinds of writing, and was material to be considered in connection with the evidence that deceased took the powders received from an unknown source and against the protest of a friend that they might be poisonous, and who reminded him of the Botkin case; and it was prejudicial error for the court to exclude such evidence.

ID.—CIRCUMSTANCES SURROUNDING DEATH—DUTY OF COURT TO BE LIBERAL IN INTEREST OF JUSTICE.—It is held that the circumstances surrounding the death of the deceased were such as to require the court, in the interest of justice, to be liberal in permitting evidence

offered by the defendant that might in any way aid the jury in determining what caused the death of the deceased.

Id.—Possession by Defendant of Envelopes Similar to Poison Envelope—Canceled Postmarks—Evidence Against Genuineness—Opinion of United States Inspector.— Where, to support the theory that the poison letter was written by defendant, the prosecution produced several envelopes from defendant's possession, which appeared to be of the same kind in all respects as the "poison" envelope, but which also appeared to bear canceled postage stamps from various postoffices outside of the state, the court properly admitted the evidence of a United States inspector to show that the stamps on six of the envelopes did not bear the genuine postmark and cancellation of the United States postoffice, where he stated in full detail the facts and reasons on which his opinion was based.

Id.—Evidence Relevant to Issue—Proof of Distinct Crime not Objectionable.—The evidence of the federal inspector was pertinent to the issue being tried, and it is not objectionable on the ground that it tends to connect the defendant with a distinct crime, not charged. ·

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial.  Frank H. Dunne, Judge.

The facts are stated in the opinion of the court.

C. H. Wilson, Samuel Shortridge, A. M. Cunning, M. H. Farrar, and T. N. Harvey, for Appellant.

U. S. Webb, Attorney General, and J. Charles Jones, for Respondent.

HALL, J.—The defendant was charged by information filed by the district attorney with the crime of murder for the killing of one Henry Bose and upon his trial the jury returned a verdict, finding him guilty of murder in the first degree, and fixing the punishment at imprisonment for life.

After 'the rendition of the verdict a change of attorneys for defendant took place, a motion for a new trial was made and denied.  Upon the rendition of judgment in accordance with the verdict, defendant appealed to this court from the judgment and order denying his motion for a new trial. ·

Harry Bose conducted in the city and county of San Francisco a small business in the way of supplying globes for

electric lights. The defendant was engaged in this business with Bose, either as an employee of Bose, or as his partner. Harry Bose at times suffered from stomach trouble. On the second day of December, 1908, he received through the United States mail by special delivery a letter addressed to him, signed "Charles M. Hawer, M. D.," and inclosing two powders, which by the terms of the letter were recommended as a cure for stomach trouble. The writer of the letter claimed to have learned from an unnamed friend of Bose that he suffered from stomach trouble and represented that he, the writer, was sending the powders at the request of the friend.

Harry Bose exhibited the letter and powders to several persons, including his mother and sister, and before retiring for the night, on December 2, 1908, took the powders as directed by the letter and shortly afterward died with the usual symptoms of strychnine poisoning. The powders contained a fatal dose of strychnine. There appears to have been no such person as "Chas. M. Hawer, M. D.," and certainly the evidence shows that Bose knew no such person.

The theory of the prosecution was and is that the letter containing the two powders was written and sent to Bose by the defendant. There was no evidence that defendant and Bose were upon unfriendly terms, and the only motive suggested for defendant killing Bose was that defendant might, upon the death of Bose, acquire the business that Bose alone, or Bose and defendant, had been conducting.

Each of three experts in handwriting testified that the letter containing the two powders was in his opinion written by the same person who wrote various exemplars, including a dictated copy of the "poison" letter, proven to have been written by defendant. Besides this opinion evidence there was little that tended to prove that defendant wrote or sent the "poison" letter. In the "poison" letter the words "until" and "already" were both misspelled, thus, "untill" and "allready," and the same errors appear in the copy written by defendant at dictation. These errors, however, are common, and such as are made by many people. Some other circumstances are relied on as indicating guilt on the part of defendant, but it is clear that the backbone of the case for the people was the opinion evidence of the experts. Certain it is that upon the theory of the prosecution, Bose ad-

ministered the powders with his own hand, and that the powders came into his possession under circumstances that would have excited the suspicions of a prudent person, and ought to have suggested caution in the use of the powders by the recipient. In this connection it may be noted that one witness, to whom Bose exhibited the letter and powders, cautioned him against using the latter, reminding him of the Botkin poisoning case, and tossed the powders into a waste basket from whence Bose recovered them.

It is not claimed that the verdict is not supported by the evidence; and we have thus adverted to the salient features of the evidence as showing a case which we think demands of this court careful scrutiny of the rulings of the trial court attacked by appellant, and which rulings the counsel for the appellant earnestly contend deprived him of the benefit of material testimony.

Defendant advanced the theory that Bose committed suicide, and himself wrote the "poison" letter, and in support of this theory offered certain testimony which appellant contends tended to support such theory. It is the action of the court in excluding this evidence that appellant in part relies upon as grounds for a reversal of the judgment and order.

Where the deceased, with his own hands, administered the poison that caused his death, and the theory of the defense is that the deceased committed suicide, any evidence which tends to support such theory, or that tends to show that it may be true, is admissible. In such case the deceased, as well as the defendant, is, in a certain sense upon trial, and evidence of any acts, conduct or declarations of deceased tending to prove that he may have committed suicide is relevant and material. (*Nordan* v. *State*, 143 Ala. 13, [39 South. 406]; *People* v. *Gehmele*, Sheldon (N. Y. Sup. Ct.), 251.)

In the case at bar the crucial test as to whether or not deceased committed suicide is presented by the question, Did he write the "poison" letter? It is thus apparent that any evidence that would reasonably tend to prove that he wrote or may have written the "poison" letter was relevant and material to the issues involved in the case.

We now come to the particular rulings of the court claimed by appellant to have resulted in depriving defendant of the benefit of material evidence.

Counsel for defendant asked a witness called for the defense: "Did you ever see deceased write any letters to himself?" and the witness answered, "I have."

Of another witness he asked, "And in your opinion what was the character of deceased?" and the witness answered, "I think—I should say that he was rather erratic."

In each case the district attorney, after the answer had been given, objected to the question, and the court after some discussion, in which both attorneys and the court took part sustained the objection. The court did not in either case in express terms strike out the answer, but the discussion and ruling were such in each case as to indicate to the jury that the court did not regard the evidence as relevant or proper, and intended that the answer should be disregarded.

Of another witness counsel for appellant asked the question: "Did you ever have any conversation with the deceased?" and the witness answered, "I did." Counsel then asked, "Relative to handwriting?" whereupon the district attorney asked, "What is the purpose of that question?" to which counsel for defendant replied, "We want to show by this witness that he boasted of doing several kinds of writing." A discussion between the court and attorneys followed, from which it is apparent that all concerned treated the question and offer as having been objected to by the district attorney. The matter ended by the court saying, "The objection is sustained."

By these rulings we think the court deprived the defendant of the benefit of evidence relevant and material to the vital issue in the case.

Evidence that deceased was erratic, at times wrote letters to himself, and was able to write several kinds of writing, though when considered apart from all other facts and circumstances in the case might be of little weight as tending to prove that deceased wrote or may have written the "poison" letter, yet in connection with other facts in evidence we think this evidence might reasonably aid the jury in determining the question whether or not deceased wrote or may have written the "poison" letter. Confessedly deceased took two powders which upon the theory of the prosecution came from an unknown source. He took these powders without taking steps to test their character, although he was cautioned

by at least one person that they might be poisonous. The danger was impressed on him by a reminder of the notorious Botkin poisoning case.

The theory that defendant wrote the "poison" letter depended almost entirely upon the opinion evidence of experts in handwriting, which is a class of evidence which is subject to some infirmities, to say the least. The circumstances surrounding the death of Bose were such as to require the court, in the interest of justice, to be liberal in permitting evidence offered by the defendant that might in any way aid the jury in determining who caused the death of deceased. We think the excluded evidence was of this character, and should have been allowed.

For the purpose of supporting the theory that the "poison" letter came from defendant, the prosecution produced several envelopes that were found in the possession of defendant shortly after the death of Bose, and which appeared to be the same kind in all respects as the envelope containing the "poison" letter. These envelopes, however, appeared to be addressed to defendant, and bore what appeared to be the post and cancellation mark of the United States postoffice at divers places outside the state of California. It thus was necessary, in order to give the envelopes any evidentiary value against defendant, as tending to show that he had had in his possession a supply of envelopes similar to the one containing the "poison" letter, to prove that the post and cancellation marks on these envelopes were not the genuine marks of the United States postal department. For this purpose the prosecution examined as a witness one James O'Connell, who testified that he had been for nine years a United States postoffice inspector employed at San Francisco, and was able to tell whether a postmark was genuine or not. He was shown by the district attorney one of the envelopes above referred to, bearing what purported to be a postmark of the United States postoffice at station H, Philadelphia, Pennsylvania, dated March 3d, 9:30 P. M., 1908, and also a cancellation mark of the postage stamp, and was asked if the postmark and cancellation mark on the envelope were the genuine postmark and cancellation mark of the United States postoffice.

To this question the defendant objected as calling for a conclusion of the witness. The objection was overruled, and

the witness answered that "The postmark is not genuine." Similar questions were asked of the witness and similar answers made concerning the post and cancellation marks on five other envelopes, without repetition of the objection.

It is now claimed that the court committed reversible error in overruling the objection. While the question is probably close to the border line, we do not think that the court erred in overruling the objection. The witness upon cross-examination stated in detail the facts and reasons why he was of the opinion that the postmark was not genuine. In such a case, even though the question should not have been allowed, a case will not always be reversed for the erroneous ruling, for the opinion usually has but little or no weight independently of the facts upon which it rests. (*Sampson* v. *Hughes,* 147 Cal. 62, [81 Pac. 292].) In the case at bar the witness had been at Philadelphia four years before the date of the trial, which would be three years before the date of the postmark, and testified that he knew that at that time there was no station "H" in Philadelphia. He also had in his possession a reproduction of the cancellation stamp in use at Philadelphia, and pointed out in detail the differences between such cancellation stamp and the cancellation stamp upon the envelope in question.

"The general rule is that the testimony of a witness shall be limited to the facts of which he has personal knowledge, and that he shall not give his individual opinion thereon; but in many instances the opinion of a witness may be received in connection with his statement of the facts upon which it is based. The border line between fact and an opinion is often very indistinct, and the statement of a fact is frequently only the opinion of the witness." (*Healy* v. *Visalia etc. R. R. Co.,* 101 Cal. 585, [36 Pac. 125].)

We think it was proper for the witness to give his opinion as to the genuineness of the postal mark in connection with his statement of the facts upon which it was based.

Neither was the testimony objectionable as tending to connect the defendant with the commission of a crime not charged. If otherwise relevant to any issue involved in the charge before the court, the mere fact that the evidence may tend to connect the defendant with some other crime is not

ground for rejecting such evidence. The evidence in question was relevant to an issue involved in the case on trial.

Inasmuch as the judgment and order must be reversed for the errors committed by the court in excluding testimony as hereinbefore indicated, we do not find it necessary to pass upon the questions raised by the affidavits concerning newly discovered evidence, and the failure of the court to render judgment within the time required by section 1191 as amended in 1909. Upon a retrial the defendant will have an opportunity to introduce the testimony of experts upon handwriting, and any other relevant and material testimony, and if he shall be again convicted the court will no doubt strictly follow the provisions of section 1191 of the Penal Code in the matter of rendering judgment.

The judgment and order are reversed, and the cause remanded for a new trial.

Kerrigan, J., and Cooper, P. J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 12, 1911.