[Crim. No. 391.    Second Appellate District.—September 8, 1915.]

## THE PEOPLE, Respondent, v. PERCY TUGWELL, Appellant.

CRIMINAL LAW—EVIDENCE—STATEMENT OF DEFENDANT.—When one part of a statement made by a defendant in a criminal action has been introduced as evidence against him, it is his right to have in evidence the entire statement, including any part of his declaration that would be in his favor.

ID.—MURDER—EVIDENCE—INTERVIEW ADMITTING KILLING—SUBSEQUENT DENIAL—SINGLE TRANSACTION.—In a prosecution for murder, where there is at issue the question as to whether the deceased came to her death by the unlawful act of some person other than herself, and the question as to whether she was killed by the defendant, in the event of an affirmative answer to the first question, and the chief deputy district attorney is permitted to testify as to an interview had in the city jail between him and the defendant in the presence of the arresting officers and other persons, including a stenographer, whose transcribed notes were followed by the witness in giving his testimony, from which it appeared that the defendant after first denying the killing, admitted that he had killed the deceased by chloroforming her, it is prejudicial error to refuse the defendant the right to cross-examine the witness as to a denial of the killing made by the defendant within five minutes thereafter in a cell to which the parties had adjourned, on the ground that such denial was not a part of the original conversation.

ID.—EVIDENCE—IDENTITY OF DEFENDANT—ERRONEOUS EXCLUSION.—In such a prosecution it is error to refuse to allow a witness, who testified as to having observed a struggle between a man and woman on the night of the crime near the place where the body was found, to say whether the defendant was the man.

ID.—EVIDENCE—SUICIDAL THREATS OF DECEASED—EXCLUSION ERRONEOUS. In such a prosecution it is error to refuse to permit the defendant to prove by an intimate acquaintance of the deceased that the deceased had made threats of committing suicide.

ID.—ADMISSIBILITY OF EVIDENCE OF SUICIDAL THREATS.—It is essential before a defendant can be found guilty of murder, that it first be established that the death has been brought about by criminal agency, and this agency must be shown to be other than the act of the person who has been killed; and statements made by the deceased, indicating an intention to commit suicide, do not come within the rule which would exclude statements made by her concerning past occurrences, such as past quarrels if any there had been between her and the accused; but such statements relate to a state of mind of the deceased, which might raise a probability that

she was disposed toward self-destruction, and thereby, in connection with the proved circumstances of her death, might suggest a probability that she did kill herself.

ID.—NEW TRIAL—NEWLY DISCOVERED EVIDENCE—INSUFFICIENT SHOWING OF DILIGENCE—PRESENCE IN JAIL.—A new trial on the ground of newly discovered evidence should not be granted, where the principal excuse urged for want of diligence in procuring the evidence on the trial, was the fact that the defendant was in jail.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Frank R. Willis Judge.

The facts are stated in the opinion of the court.

Earl Rogers, and H. L. Giesler, for Appellant.

U. S. Webb, Attorney-General, and Robert M. Clarke, Deputy Attorney-General, for Respondent.

CONREY, P. J.—By verdict of a jury, and judgment pursuant thereto, the defendant has been convicted of murder in the first degree, and sentenced to imprisonment in the state prison at San Quentin for the term of his natural life. He appeals from the judgment and from an order denying his motion for a new trial.

In order to determine whether a new trial should have been granted on account of errors occurring at the former trial it is necessary to review the circumstances shown by the evidence. In general terms, two questions are at issue. Did the deceased come to her death by the unlawful act of some person other than herself? If the first question be answered in the affirmative, then was she killed by the defendant?

On Monday, the thirty-first day of August, 1914, Mrs. Maud Kennedy, a widow and about 48 years old, was living at 1057 East Twenty-first Street, at the corner of Griffin Avenue, in the city of Los Angeles. She was of slight figure, weighing not far from one hundred pounds. Living with her at that place were her son Philip and his wife Pearl M. Kennedy, and one Bert de Normandy who appears to have been there as a boarder. Philip was only 20 years old, and he and his mother had been living at that place for about twelve years.

On said thirty-first day of August, the defendant Percy Tugwell, then not quite 21 years old, was living with his parents and their other children at 842 East Thirty-first Street, which would be several blocks southwesterly from the residence of Mrs. Kennedy. At the same time there lived with the Tugwell family a young woman named Thelma Small to whom Percy Tugwell was about to be married, and whom he did marry on the fourth day of September, 1914.

Jefferson Street is an east and west thoroughfare between and parallel to Thirty-third and Thirty-fifth streets. On San Pedro Street below Thirty-sixth Street, southwesterly from the Tugwell residence and about nine blocks therefrom, was a garage, to which further reference will be made.

Sixth Avenue intersects with West Jefferson Street, at a point about four miles west of San Pedro Street. Seventh Avenue is one block west of Sixth Avenue. The scene of the alleged murder was in or near an alley running from Sixth Avenue, to Seventh Avenue, one-half of a block north of Jefferson Street.

According to the testimony of Philip Kennedy, two telephone calls were received by his mother on the evening of August 31st; one at 6 o'clock and one at half past 7. Following the second call Mrs. Maud Kennedy prepared to go out, and left the house at about five minutes before eight. Mrs. Kennedy, according to this testimony, possessed some valuable diamonds, and when she went out on this occasion wore at least five diamond rings. It was her custom to wear under her dress, and fastened around her neck, a chamois skin bag in which she kept such diamonds as she was not using. Philip testified that his wife and Bert de Normandy were present when Mrs. Maud Kennedy left the house. Philip's wife testified that on that evening Maud Kennedy went out at a little before eight. Normandy was not a witness at the trial. Mrs. Sadie Starr who lived opposite the Kennedy residence, testified that on the evening of August 31st, between half past 7 and 8 o'clock, she saw Mrs. Kennedy come from her house and take the Griffin Avenue car going south. That car, the evidence shows, would go to Jefferson Street.

On the morning of September 1, 1914, in response to a call sent in to the University Police Station at 825 West Jefferson Street, Police Officer G. A. Cummings and Officer Bistillos went out to Sixth Avenue, and to the alley before mentioned.

There they found the body of Mrs. Maud Kennedy. There was a telephone pole on the north side of the alley, about twenty feet west of the sidewalk line. Cummings testified that the woman was dead; that she was lying on her back, with her feet against the post; the mouth open and blood thereon; the lips red, as if something had burned them; the left glove and left shoe off; an open chamois skin bag within the bosom of her dress, containing only an "Elk charm" in which was a picture of a small boy. On the ground near by and within ten feet of the street, the officers found the missing glove and shoe, a string of coral beads, a hat pin "and a cork which had a considerable smell of ammonia on it." At a short distance, across the alley, there was a line marked on the ground, such as would be made by dragging a heavy object, but this mark did not lead to the place where the body was found.

A physician and surgeon, acting as "county autopsy surgeon," made an autopsy of the body, by request of the coroner, on the second day of September. He testified that he found some slight scratches and bruises about the head. "The lips and tongue were shredded, that is, corroded, and of a dark brown color. The interior of the mouth was similarly affected. The larynx and vocal cords were swollen and contracted and of a deep red color. The trachea, down to its bifurcation was of the same intense red color, as well as the upper half of the œsophagus. The stomach was normal, but the lungs were watery and swollen, so as to cover the heart area. The sac around the heart showed numerous small hemorrhages; the brain was edematous, watery. There were indistinct marks about the thoat. . . . The cause of death was corrosive volatile poison, such as ammonia, which caused strangulation by its irritant action upon the epiglottis and its inflammatory action upon the larynx and trachea." In response to further questions the autopsy surgeon testified that the conditions found by him on the deceased might have been caused by an application of chloroform given as a liquid. Referring to commercial chloroform, as distinguished from the chloroform used for anaesthetic purposes in medical practice, this physician said that "one is just as strong, just as irritant as the other." He testified that the poison which caused the death of Mrs. Kennedy could not have been self-administered; that "a strong poison of that kind would have to be

forced into the mouth and the irritant action of such a thing as concentrated chloroform or ammonia would make it almost impossible for anybody to take up a bottle and pour it down the throat.'' He further said on his cross-examination that he did not see any other way in which the poison could have been administered than by applying a bottle or receptacle of some kind to the lips of the deceased.

The only evidence showing that the defendant ever had in his possession either one of the poisons indicated, relates to a bottle of chloroform, of which we shall have more to say. In presenting its evidence at the trial, the prosecution relied wholly upon the testimony of the autopsy surgeon to establish that Mrs. Kennedy's death was caused by the use of the chloroform and that it could not have been self-administered by the victim. This is worthy of special note, in view of the fact that in support of defendant's motion for a new trial, no less than eight physicians declared by their affidavits that upon the facts contained in the testimony of the autopsy surgeon, there is nothing to indicate to them that the poison could not have been self-administered.

The prosecution's theory of the case against the defendant was that defendant was in need of money to enable him to marry and take his bride to San Francisco; that to obtain this money he planned to rob Mrs. Kennedy of her diamonds; that he procured a bottle of chloroform; that by a telephone request he lured this woman of more than twice his age to meet him at night at the lonely place where her body was found; that he met her there and murdered her by forcing chloroform into her mouth.

Excluding now from consideration the confession to which we shall refer later, the circumstances produced in evidence as to the conduct of the defendant are in substance as will now be stated. In the early part of the year 1914, the defendant had been employed in the Metropolitan Dye Works, a clothes cleaning establishment at Los Angeles. On April 10, 1914, by some accident his left arm was broken. His physician's testimony shows that this arm was carried in a sling until late in June. Defendant did not work in the dye works after the arm was broken. Llewellyn Gorsuch, son of the manager of the dye works, and employed there during the summer vacation of the public schools, testified that during that vacation, after the middle of the period running from

the twenty-seventh day of June to the first week in September, he filled for the defendant a bottle brought to him by the defendant, by pouring into the bottle chloroform from the supply of chloroform used there in cleaning clothes, and the defendant told witness that he wanted to use some chloroform for that same purpose.

The defendant and Philip Kennedy had been friends for five or six years, and through that association of the two boys, defendant had become acquainted with Philip's mother. From the testimony of Philip and Pearl Kennedy we learn that the defendant called at their home on Thursday or Friday preceding Monday, August 31st, and conversed privately for a few minutes with Mrs. Maud Kennedy; also that on the morning of September 1st, defendant called there again and asked for Mrs. Maud Kennedy. Mrs. Pearl Kennedy testified that soon after 8 o'clock that morning, and shortly before defendant came, she answered a telephone call, and a man inquired whether Mrs. Kennedy was at home; that witness replied that Mrs. Kennedy would be in at about 6 o'clock. In answer to the district attorney's question, ''Did it sound like Tugwell's voice disguised,'' the witness said it did. There is no testimony connecting defendant with either one of the telephone messages received by the deceased before she went out from her house on the evening of August 31st.

The garage to which we have referred appears to have been a place of resort for several young men who were acquaintances of the defendant. Two of these were Henry Strock and Roy E. King. Strock was called as a witness for the people, and testified that at about 8 o'clock on the evening of August 31st he and King met the defendant at Thirty-sixth Street and South Park on his way to the garage, and talked with him for ten or fifteen minutes. Also that at noon of the same day the defendant had asked witness to lend him a few dollars and had asked witness ''where can we make money?'' Also that three or four weeks earlier than August 31st defendant had asked for a loan, saying that he wanted money to get married on; that on several former occasions he had loaned money to the defendant which always was paid back. King, called as a witness for defendant, agreed with Strock in his testimony as to the time of meeting and conversing with the defendant on the evening of August 31st. On behalf of the state no further testimony was produced of any

witness claiming to have seen the defendant that night. Several members of defendants' family testified, admitting that he went out before 8 o'clock, but declaring that he returned home not later than fifteen minutes after nine; also that he did not use the telephone before leaving the house.

Dorris Widemeyer, a witness for the prosecution, testified that on the evening of August 31, 1914, at a quarter to 9 o'clock, she walked south on the east side of Seventh Avenue from 3024 Seventh Avenue to a place south of Jefferson Street. When she arrived at a point about forty or sixty feet north of the alley before mentioned she heard groans proceeding from the vacant lot there, and saw figures of persons only six or eight feet away from her. It was quite dark, but in her judgment one of those figures was lying down and the other was bending over. She could not say, as to either of them, whether it was a man or was a woman. The witness passed on. When she returned past that place at half past nine there was no one there. The place thus described was distant a little more or less than two hundred feet from the place where Mrs Kennedy's body was found the next morning. The witness Dorris Widemeyer was the only witness produced by the prosecution testifying to any fact occurring in that vicinity on the night in question, and she did not identify the defendant.

Henry L. Keller, an architect, called by the defendant, testified that at about half past nine on the same night, while returning to his home on the west side of Seventh Avenue north of Jefferson, as he was walking along a path across the vacant lot next to Seventh Avenue he observed, about sixty feet from him, a woman walking north on Seventh Avenue, followed by a man. When the man overtook the woman they walked back a few feet to a point on the lot. There was a struggle and a gurgling noise, or slight mumbling noise. The witness crossed the street to his own premises and from there saw that the man was carrying or dragging something, and with this burden disappeared behind a shed. It does not appear that this witness raised an alarm, or interfered at all in this extraordinary scene. The court refused to allow the witness Keller to say whether the defendant was the man referred to in his testimony, or whether witness had noticed the size of the man, whether large or small.

Albert Yanow, a bill collector, called as a witness for the defendant, testified that at about half past eight on the night of August 31, 1914, on a street car going out West Jefferson Street, he saw a woman, who was wearing "a whole lot of diamonds," and another man on the car was watching her very keenly. This woman left the car at Harvard Boulevard, and at the next street this man hurried off the car and went back to where this woman got off the block before. The woman apparently was a little past forty years old, and weighed probably 105 to 110 pounds. Harvard Boulevard, as we gather from the testimony, must be more than a mile east of Sixth Avenue. The court refused to allow Yanow to testify that the man referred to by him was not the defendant.

With one possible exception, there is no evidence tending to show that defendant ever had possession of any jewelry or other property of the deceased. There is testimony not denied by the defendant that on September 2, 1914, defendant placed in the hands of Albert Theissinger, a jeweler, a diamond, and that Theissinger sold it for him, returning forty-five dollars to the defendant. Witness came to the Tugwell residence for this diamond, in response to a telephone request of the defendant, who told witness that the diamond belonged to Thelma Small. Theissinger sold this diamond to George A. Christensen, a jeweler, and Christensen's testimony is that he disposed of it to one J. C. Ferguson. Without producing Ferguson as a witness, the prosecution had in court a diamond, concerning which Christensen said that "to the best that I can remember, it is the stone." Defendant's wife (formerly Thelma Small) testified that at the time in question she gave a diamond to defendant for the purpose of having it sold, and knew that Theissinger was selling it; that she had previously worn it in a ring, from which it had been loosened by accident; that the diamond produced in court was, in her opinion, the one she had given defendant to sell. Several witnesses testified to the fact that Thelma Small had posessed a diamond ring of similar description. W. H. Starr, a sign painter who lived in the neighborhood of the Kennedy family, testified that in his opinion the diamond shown in court was the same as one which Mrs. Kennedy had shown to him a short time before her death, and which at her request he had examined.

At the trial after the people had rested their case and several witnesses had testified on behalf of the defendant, the case for the people was reopened in order to admit some testimony which the district attorney stated was not known until the previous day. This testimony was given by Raymond L. Aaron, one of the youths who frequented the garage. He testified that about five months before August 31, 1914, the defendant had proposed to him that "he (Tugwell) would get Phil Kennedy and his wife a couple of theater tickets, to go to the show, if Mrs. Kennedy was over to his house, then get in the house and get her diamonds when she come home." It is worthy of remark that this witness was brought into court by means of a most extraordinary kind of subpoena. On the night before he testified he was arrested, handcuffed, and taken to jail, where he was kept until wanted in court. No excuse was made for this outrage. Evidence thus produced was entitled to the smallest credit, but may have been believed.

On the eighteenth day of October, 1914, the defendant was arrested in San Francisco. In the custody of two police officers from Los Angeles, he was detained until they brought him to Los Angeles, where they arrived on October 20th. On that day occurred the alleged confession. We shall not enter into a discussion of the circumstances leading up to the confession. If the officers were as careful of the defendant's rights as they have stated in their testimony, the confession was freely and voluntarily made. If their conduct was as sworn to by the defendant, the use in evidence of any statements obtained by them from the defendant would be a gross perversion of justice. The evidence as to those circumstances being in conflict, we must assume that the testimony concerning defendant's confession was properly admitted.

On October 20th, there was an interview at the city jail of Los Angeles, between the defendant and W. J. Ford (chief deputy district attorney), in the presence of the officers who had brought the defendant to Los Angeles, and of several other persons, including a stenographer whose transcribed notes were followed by Mr. Ford in testifying to this interview. This testimony sets forth a long statement made by the defendant, which, if true, would strongly tend to show that Mrs. Kennedy was killed by her son Philip. Mr. Ford then sent for Philip Kennedy, who was under arrest in the

jail, and the defendant renewed his charges against Kennedy, who vehemently denied the same, and was then taken back to his cell. Thereupon Mr. Ford sent for de Normandy, who was imprisoned in another cell. At this point the defendant requested to have a private interview with Mr. Home, one of the officers who brought him from San Francisco, and this request was granted. After that, the defendant asked to speak to Mr. Ford in the alcove where he had been speaking to Mr. Home, and this request was granted. Then at defendant's request he was allowed to talk again with Mr. Home. Finally, they all came back to the room where the stenographer was waiting, and after some preliminary questions the defendant said that he had killed this woman by chloroforming her with chloroform that he had obtained at the dye works. The details of the crime as given in this confession in many particulars fail to harmonize with the circumstances shown in the evidence given by the witnesses, Cummings and Widemeyer, but the facts as confessed are sufficient to support a verdict of conviction.

Mr. Ford testified that as the interview between himself and the defendant was closing, the defendant said, "I want to see Phil Kennedy, and shake hands with him," and that "we took him upstairs to the cell where Phil Kennedy was confined." Defendant's counsel then asked Ford, " What did you do after you reached the cell where Mr. Kennedy was confined?" Objection to this was sustained on the ground that the question related to a different time and place than the testimony given on direct examination. The next question was whether or not in the jail and within five minutes after this statement which the witness had just read to the jury the defendant was asked by Mr. Ford, "Are you guilty of the murder of this woman?" And he said, "No, I am not. What I have just said, it is all a lie; it is a frame-up. I didn't kill her." Objection was made to this question, and after some discussion counsel for defendant asked, "Was there any further conversation after you did get up there?" Objection to this question was sustained, apparently on the ground that the matter was not cross-examination, nor part of the preceding conversation.

The defendant as a witness in his own behalf testified to this latter statement and offered to show the same facts by two other witnesses who were present at Kennedy's cell. Ob-

jections to this offered corroborating testimony were sustained. The jury may have disbelieved the testimony of the defendant alone. If it had been supported by the testimony of these two witnesses and of Mr. Ford they must have been convinced. The rule is, it must be admitted, that when one part of a statement made by a defendant has been introduced as evidence against him it is his right to have in evidence the entire statement, including any part of his declaration that would be in his favor. The facts above set forth do not show any substantial break in continuity of the interview between Ford and the defendant until after they had adjourned to the cell of Kennedy. The evidence rejected was not part of a separate transaction, but was undoubtedly a part of the same transaction which had been very elaborately described in the Ford testimony. It follows that the court's rulings in this matter were erroneous. (Code Civ. Proc., sec. 1854; *People* v. *Hutchings*, 8 Cal. App. 551, 557, [97 Pac. 325]; *People* v. *Yeaton*, 75 Cal. 415, 418, [17 Pac. 544].)

The ruling to which we have referred, excluding testimony of the witness Keller as to whether or not the man whom he saw at the time and place stated, was the defendant, was erroneous. In view of the previous testimony of the state's witness Widemeyer, the defendant was entitled to show, as he did, that Keller witnessed an incident which apparently was the same as that shown by Widemeyer, and was further entitled to show, if he could, by Keller's testimony, that defendant was not the man whom he saw that night on the vacant lot.

The similar ruling made during the examination of the witness Yanow may be disregarded, as the circumstances related by Yanow occurred at such a great distance from the scene of the alleged murder that it is difficult to appreciate their relevancy to the case.

Mrs. Phamie Tugwell, mother of the defendant, was shown to have been well acquainted with the deceased. During the direct examination of Mrs. Tugwell as a witness for the defendant, his counsel asked her: "Do you know whether or not Mrs. Kennedy ever made any threats of committing suicide?" The district attorney made the general objection, and that the question was "not within the issues," and his objection was sustained. Immediately before the close of defendant's case defendant's counsel said: "One other matter, your honor, regarding the suicidal matter. At this time I re-

new the request to be permitted to show Mrs. Kennedy made
certain statements about herself.'' The court replied, ''Motion denied.'' This later offer, standing alone, would be too
indefinite to deserve favorable consideration, but it rests upon and is explained by the previous question and the ruling
thereon. The objection to the question asked of Mrs. Tugwell did not relate to any defect in the form of the question,
and we must assume that the court was ruling upon the question as to the admissibility of statements made by the deceased
which indicated some intention to commit suicide. We must
further assume that except for the ruling of the court, the
witness would have testified concerning statements of that
character, made by the deceased.

Manifestly, before a defendant can be found guilty of murder, the fact must first be established that the death in question has been brought about by criminal agency. (Bouvier's
Law Dictionary, Rawle's 3d Revision, topic *Corpus Delicti.*)
This criminal agency must be shown to be other than the act of
the person who has been killed. Statements made by the deceased, indicating an intention to commit suicide, do not come
within the rule which would exclude statements made by her
concerning past occurrences, such as past quarrels if any there
had been between her and the accused. The statements here
in question relate to a state of mind of the deceased, which
might raise a probability that she was disposed toward self-destruction, and thereby, in connection with the proved circumstances of her death, might suggest a probability that she
did kill herself. Our opinion that the testimony should
have been admitted is confirmed by the decision of the third
district court of appeal, in *People* v. *Wilson,* 14 Cal. App.
518, [112 Pac. 579], which, as we are advised, is the only
California case which bears closely upon the question at issue.
There the court said: ''Where the deceased, with his own
hands, administered the poison that caused his death, and
the theory of the defense is that the deceased committed suicide, any evidence which tends to support such theory, or that
tends to show that it may be true, is admissible. In such
case the deceased, as well as the defendant, is, in a certain
sense, upon trial, and evidence of any acts, conduct, or declarations of deceased tending to prove that he may have committed suicide, is relevant and material. (*Nordan* v. *State,*

143 Ala. 13, [39 South. 406]; *People* v. *Gehmele,* Sheldon
(N. Y. Sup. Ct.) 251.)'' A petition for rehearing of the
Wilson case was denied by the supreme court. We think that
the rule above stated is applicable here, even without direct
evidence that poison was administered to Mrs. Kennedy
''with her own hands.'' That evidence of declarations by
deceased, indicating that suicide was intended or was in con-
templation, may be introduced by the defendant in a case
of this kind, is the rule established in Massachusetts by the
leading case of *Commonwealth* v. *Trefethen,* 157 Mass. 180,
[24 L. R. A. 235, 31 N. E. 961], approved in *Commonwealth*
v. *Howard,* 205 Mass. 128, 152, [91 N. E. 397]. (See, also,
*State* v. *Beeson,* 155 Iowa, 355, Ann. Cas. 1914-D, 1275, [136
N. W. 317].)

It is true as stated by the attorney-general in his brief,
that the contrary rule is followed in some other jurisdictions:
*Siebert* v. *People,* 143 Ill. 571, [32 N. E. 431], and *State* v.
*Fitzgerald,* 130 Mo. 407, [32 S. W. 1113]; and that in the
latter decision the Trefethen case is discussed and criticised.
We are satisfied, however, that the weight of authority, as
well as of reason, is in favor of the admissibility of such evi-
dence where the fact of death by homicidal agency is one of
the actually disputed issues.

The motion for a new trial was based not only upon the
errors claimed, but upon the ground of newly discovered evi-
dence, supported by many affidavits. There is a sad want of
diligence shown in the matter of procuring this evidence for
the defendant at and before the time of the trial, and we are
not favorably impressed by the excuses urged in behalf of
the defendant. The fact that he was in jail did not deprive
him of his legal rights. His father, and others of his family,
were active in his behalf, and it must be presumed that the
defendant had full benefit of counsel, nothwithstanding the
severe criticisms of the former attorney which we find in the
briefs on appeal. There is no sufficient reason for granting a
new trial on account of ''newly discovered evidence.''

The errors to which we have adverted were prejudicial to
the defendant, because they deprived him of evidence to which
he was legally entitled, relating to matters of which some at
least were vital to his defense. To deprive him of such rights,
on the case shown by ''examination of the entire cause, in-

cluding the evidence'' contained in the record herein, would be a ''miscarriage of justice.''

The judgment and the order denying defendant's motion for a new trial are reversed.

James, J., and Shaw, J., concurred.