[Crim. No. 3989. Fifth Dist. Nov. 19, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
DENNIS GENE TAYLOR, Defendant and Appellant.

## COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Ezra Hendon, Chief Assistant State Public Defender, Tom Lundy, Michele Vague and Steven W. Parnes, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, James T. McNally, Eddie T. Keller and Lisa Lewis Dubois, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HOPPER, J.**—In this case we consider several issues with respect to the second degree felony-murder rule (where furnishing of heroin is the underlying felony), the applicability of the accomplice rule, an alleged *Miranda* violation and asserted error in the exclusion of evidence on suicide. We conclude that reversible error took place by the exclusion of the evidence of declarations on suicide. The other contentions by appellant are without merit.

### STATEMENT OF THE CASE AND FACTS

Appellant (Taylor) was charged with murder of Martin Hendrix, furnishing and giving away heroin on January 27, 1978, murder of Andrew J. Clarke (Clarke) and furnishing and giving away heroin on January 30, 1978. He was found guilty of second degree felony murder of Clarke and of furnishing and giving away heroin on January 30, 1978, but not guilty of the remaining charges.

On January 29, 1978, Mark Cantwell (Cantwell), his wife (Tammy), and Clarke, were drinking beer at Cantwell's apartment. Throughout

the day Cantwell and Clarke had imbibed enough beer to have "a good buzz going."

During the afternoon Robert Peek (Peek), and in the evening Taylor and Doug Corning (Corning), dropped by the Cantwell residence. Taylor drank a few beers.

Between 8 and 9:30 that night Clarke, Taylor and Cantwell decided to go to a liquor store to buy more beer. Appellant and Clarke asked Cantwell to drive because they were too drunk.

They then went to a liquor store, bought two 6-packs, and drove to Clarke's house where they arrived between 10:30 and 11 o'clock. Clarke had suggested that they go to his house.

Cantwell, Clarke and Taylor entered the house and Taylor and Clarke went into the kitchen. Cantwell followed and saw a spoon on a table, a glass of water, and a syringe. Cantwell then saw Taylor handing Clarke a tinfoil packet. At one point Cantwell testified that he may have held the packet on the way back from Clarke's to Taylor's.

The packet contained heroin of a particular type called China White. Taylor told Clarke he could do with the heroin what he wanted, and that the heroin was not that good. Taylor also said that he had taken approximately one gram one hour before he had arrived at Cantwell's residence.

Clarke then prepared the heroin for injection. Cantwell observed that the heroin seemed pure because of its reaction with the water and Cantwell told Clarke not to take so much because they had been drinking all day and heroin should not be mixed with alcohol. After an argument, Cantwell said he would inject one-half to keep Clarke from doing it all.

Cantwell explained to Clarke how to heat up the heroin to remove any impurities. Cantwell also assisted Clarke in tying off Clarke's arm. Clarke injected himself. Cantwell had injected Clarke a few times before this date.

Cantwell then injected the remaining heroin and went into a bedroom and passed out.

At around 11:30 that evening Taylor knocked on Kathy Banks' (Kathy) door and asked for the phone number of Tammy. Kathy lived next door to her brother, Clarke. Kathy refused the request but called Tammy anyway. Taylor interrupted on an extension in Clarke's house and anxiously told Tammy to quickly "get over here."

Tammy, Corning and Peek drove to Clarke's residence. About 45 minutes after they arrived Clarke began to have difficulty breathing. He was given mouth-to-mouth resuscitation, but the difficulties in breathing returned so Tammy called the paramedics.

The paramedics arrived at around 3:17 a.m. on January 30. Clarke was taken to a hospital where he was dead on arrival.

According to the coroner, the heroin and alcohol both caused Clarke's death.

Meanwhile Sheriff McDonald (McDonald) of Stanislaus County arrived at the Clarke residence at approximately 3:30 a.m. After an examination McDonald was of the opinion that Taylor was under the influence but did not arrest him. McDonald asked Taylor to go with him to the hospital and Taylor agreed. On the way to the hospital Taylor told McDonald about the incident.

Tammy, Peek and Corning had also gone to the hospital. At the hospital Clarke's wife, Janie, who subsequently arrived, accused Taylor of killing her husband. The evidence is disputed whether Taylor answered.[1]

At the hospital that morning Officer Matt of the Stanislaus County Drug Enforcement Unit interviewed Taylor. After giving Taylor his *Miranda* rights Taylor related the events of that evening.

Taylor did not testify but for impeachment purposes did call two deputy sheriffs who interviewed Peek, Tammy, Cantwell and Corning subsequent to Clarke's death. Additional facts, where relevant, are set forth hereinafter.

We consider seriatum the various defense contentions.

---

[1]Janie Clarke could not remember if Taylor replied "I didn't give him that much" or "I didn't do it to him." Tammy said Taylor replied, "I didn't give him that much" and Peek did not hear Taylor respond at all.

SECOND DEGREE FELONY MURDER

■ Taylor first contends that he cannot be convicted of second degree felony murder because there is no statutory authorization for the crime. The contention is that the offense of second degree felony murder is a common law crime created by the courts and as such violates Penal Code section 6 which abolished common law crimes. Furthermore, Taylor asserts that reliance by the Attorney General on *People v. Doyell* (1874) 48 Cal. 85, and *People v. Olsen* (1889) 80 Cal. 122 [22 P. 125], is to no avail because those cases relied solely on the law prior to 1872 (the date of the enactment of Pen. Code, § 6), and that rather than looking to Penal Code sections 187 defining murder and 188 defining malice, the Attorney General assumes that Penal Code section 189 alone is the code section embodying the offense of second degree felony murder which Taylor argues is judicial legislation prohibited by Penal Code section 6. We are not persuaded.

While there are no common law crimes in this state, it is proper for the courts to turn to the common law as a source of interpretation of an existing statute. Simply stated, the term "murder" in the Penal Code includes second degree felony murder. Such concept "lies imbedded in our law" (*People v. Phillips* (1966) 64 Cal.2d 574, 582 [51 Cal.Rptr. 225, 414 P.2d 353]; see also *People v. Henderson* (1977) 19 Cal.3d 86, 92 [137 Cal.Rptr. 1, 560 P.2d 1180]) and it would be improper for an intermediate appellate court to hold to the contrary.

Additionally, we agree with the Attorney General that the Legislature intended to include within the definition of second degree murder the common law felony-murder rule and that under settled principles of statutory interpretation, it is presumed that the Legislature is aware of, and approves, the judicial construction of Penal Code section 189 embodying the second degree felony-murder rule. The 1872 enactment of Penal Code section 189 adopted the wording of the 1856 amendment to the Crimes and Punishments Act providing for second degree murder. The second degree murder authorized in Penal Code section 189 was the same as previously provided for by statute. (*People v. Sanchez* (1864) 24 Cal. 17, 29, wherein the court said that the Legislature intended by the 1856 amendment to assign to first degree murder all murders of a cruel and aggravated character and to the second degree "all other kinds of murder which are murder at common law..."; see also Code Commissioners note to Penal Code section 189 cited with ap-

proval in *People* v. *Wiley* (1976) 18 Cal.3d 162, 170-171 [133 Cal. Rptr. 135, 554 P.2d 881].) The Legislature intended by Penal Code section 189 to define second degree murder and to include therein felony murder. Penal Code section 6 does not compel a different analysis and is really inapposite. In short, the Legislature intended to place in the second degree murder category all kinds of murder (other than first degree) which were murder at common law. Taylor's contention to the contrary is without merit.

Next, Taylor contends that the extension of, and application of, the felony-murder rule to this case is unwarranted for several reasons: (1) the prosecution failed to establish that the death of Clarke was the *sole* direct causal result of the commission of the felony charge; (2) the homicide did not occur during the res gestae of the felony of furnishing heroin; (3) the prosecution must establish (and failed to so do) that Taylor administered as well as furnished the heroin; and (4) since the jury could have found the purpose of the furnishing of heroin was to accomplish the murder, the furnishing was an integral part of the homicide and should not have formed the basis for a felony-murder conviction. We discuss each of those arguments by reference to their respective numbers.

As to (1), *supra*, the record shows that Clarke died of cardio-respiratory arrest as the result of the combined effect of heroin and alcohol. Neither the alcohol nor the heroin alone would have been significant enough to cause death. The court instructed the jury that death need only be *a* direct causal result of the felony and that concurrent causes of death would be sufficient to establish the liability. Taylor contends that "In light of the fact that the felony-murder doctrine is highly artificial and must be given the narrowest possible application...the trial court erred by failing to require the jury to find that the conduct of [Taylor] was the sole cause of death." The contention is without merit. As Witkin says in 1 Witkin, California Crimes (1963) Elements of Crimes, section 80, page 80: "The defendant may also be criminally liable for a result directly caused by his act, even though there is another contributing cause." We reject the argument that in the context of the felony-murder rule the concept of causation must be strictly and narrowly drawn. No cases supporting such an argument have been called to our attention and we see no sound public policy reason to so limit the causation element.

■ With respect to (2), *supra*, Taylor asserts that he cannot be convicted of second degree felony murder because the act of furnishing heroin was completed when he handed the heroin to Clarke and thus the homicide was not committed in the perpetration of the felony. We disagree. It is sufficient under the felony-murder rule that the felony and the homicide are part of one continuous transaction (*People* v. *Fuller* (1978) 86 Cal.App.3d 618, 623 [150 Cal.Rptr. 515]). Such was the case here. There is no requirement that the homicide occur while commiting, or while engaged in the felony, or that the killing be part of the felony. It is sufficient that the homicide be related to the felony and have resulted as a natural and probable consequence thereof (*People* v. *Chavez* (1951) 37 Cal.2d 656, 669-670 [234 P.2d 632]).

Even accepting Taylor's contention that the felony ended when he handed the package to Clarke, the felony and the homicide were still part of one continuous transaction. After Taylor handed the package to Clarke, Clarke immediately began preparations to inject the heroin. This was not a case where a large amount of time elapsed between the felony and the homicide so as to allow for intervening events to occur. Rather it was Taylor's very act of furnishing the heroin to Clarke while Clarke was under the influence of alcohol that caused Clarke's death.

Nor does it follow that the trial court's finding that for purpose of the accomplice instruction the crime of furnishing heroin was completed when the heroin was handed to Clarke is inconsistent with or even the same type of finding made for felony-murder rule purposes.

■ As regards (3), *supra*, we do not agree that the prosecution must establish that Taylor furnished *and administered* the heroin. The mere furnishing is sufficient (*People* v. *Taylor* (1970) 11 Cal.App.3d 57, 59 [89 Cal.Rptr. 697]; see also *People* v. *Poindexter* (1958) 51 Cal.2d 142, 149 [330 P.2d 763], and *People* v. *Mattison* (1971) 4 Cal.3d 177, 184-186 [93 Cal.Rptr. 185, 481 P.2d 193]). Reliance on *People* v. *Mayfield* (1964) 225 Cal.App.2d 263 [37 Cal.Rptr. 340], by Taylor is to no avail. In *Mayfield* the felony-murder conviction could not stand because there was no violation of the furnishing statute. The intimation in *Mayfield* that furnishing would not support a second degree murder conviction is dicta. The furnisher is liable even though the deceased did the actual administering (see *Ureta* v. *Superior Court* (1962) 199 Cal. App.2d 672, 676 [18 Cal.Rptr. 873], and *People* v. *Cline* (1969) 270 Cal.App.2d 328, 332 [75 Cal.Rptr. 459, 32 A.L.R.3d 582]; see, gener-

ally, Annotation, Homicide: Criminal Liability for Death Resulting from Unlawfully Furnishing Intoxicating Liquor or Drugs to Another (1970) 32 A.L.R.3d 589).

■ With respect to (4), *supra*, in effect Taylor is arguing that the court should have instructed *sua sponte* on first degree murder because the felony of furnishing heroin merged with the homicide. We disagree. A careful reading of the record discloses no facts which would warrant a conclusion that Taylor's purpose in furnishing the heroin to Clarke was to murder him. Thus, a *sua sponte* instruction on first degree murder was not required (see *People* v. *Sedeno* (1974) 10 Cal.3d 703, 715, [112 Cal.Rptr. 1, 518 P.2d 913] disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]).

## ACCOMPLICE INSTRUCTIONS

■ Taylor contends that the trial court committed reversible error in refusing to instruct the jury that Cantwell aided and abetted the commission of the felonies and thus was an accomplice. The contention is without merit.

The charging allegations in the original information with respect to Health and Safety Code section 11352 read: "Furnishing, administering and giving away heroin." On the seventh day of trial and after the presentation of all evidence the information was amended over defense objection to delete the word "administer." In closing argument the district attorney specifically pointed out that Cantwell had helped Clarke administer the heroin.

Taylor asserts that the evidence presented on Cantwell's participation compels the conclusion that he aided and abetted the furnishing of the heroin and that the trial judge's ruling "dissecting the conduct into discreet offenses is artificial and contrary to the approach taken by the courts to determine accomplice liability." We are not persuaded.

Penal Code section 1111 provides in pertinent part that an accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

Taylor had the burden of showing Cantwell was an accomplice (*People* v. *Tewksbury* (1976) 15 Cal.3d 953, 963 [127 Cal.Rptr. 135, 544 P.2d 1335]).

The prohibitions in Health and Safety Code section 11352 re sale, transporting, furnishing, administering, and giving away are in the disjunctive. A violation of each of those acts is a separate offense (*People* v. *Gurrola* (1963) 218 Cal.App.2d 349, 352 [32 Cal.Rptr. 368] (cited with approval in *People* v. *Rogers* (1971) 5 Cal.3d 129, 135 [95 Cal. Rptr. 601, 486 P.2d 129]) construing Health & Saf. Code, § 11501, the predecessor of the present Health & Saf. Code, § 11352). On the facts in this case Cantwell was not liable for the identical offense charged against Taylor. The record shows that while Taylor may have been liable for administering heroin, he was not liable for furnishing or giving away heroin. Taylor's assertions to the contrary notwithstanding, we find no evidence in this case that Cantwell aided and abetted Taylor in the furnishing of heroin. When Cantwell helped administer the heroin, he aided and abetted Clarke, the recipient of the heroin, not Taylor the furnisher. Cantwell was not an accomplice.

In sum, each of the criminal acts described in Health and Safety Code section 11352 are separate and distinct offenses for the purpose of determining a witness' status as an accomplice (see *People* v. *Boyce* (1980) 110 Cal.App.3d 726, 733-734 [168 Cal.Rptr. 219] (a Pen. Code, § 496 charge)). Refusal to give the offered instruction was not error.

As indicated, *supra*, we reject Taylor's assertion that the trial court's finding that the felony of furnishing and the homicide are part of one continuous transaction is inconsistent with the ruling of the court as to Cantwell not being an accomplice. Differing concepts are involved. In the felony murder situation the issue is whether there is one continuous transaction between the felony and the homicide which by definition does not involve identical offenses, whereas in the case of an accomplice instruction the issue is whether the accomplice is liable for the identical offense charged against the defendant on trial.

MIRANDA WAIVER

■ Taylor contends he was so heavily drugged that his statements to Officer Matt should be suppressed as being involuntary under *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]).

On January 30th, the day Clarke died, Officer Matt (Matt) interviewed Taylor at the hospital. Matt gave Taylor the *Miranda* warning. Matt also asked Taylor if he understood his rights and Taylor promptly answered yes.

Matt interviewed Taylor from about 5:15 to 7:30 a.m. in a room at the hospital. Matt saw that Taylor was in a heavy state of somnolence and was heavily under the influence of drugs.

During the interview, Taylor would occasionally nod, fall asleep and Matt had to wake him up twice with a loud voice.

Nevertheless, the answers appeared responsive. Taylor did not appear confused and there was no evidence of loss of train of thought.

Taylor told Matt of his heroin use; that on January 29th he used heroin called China White packaged in tinfoil; that he met Clarke in a bar on the night of January 29th and that he gave Clarke a ride to Clarke's home and there he heard Clarke fall on the floor.

Matt testified that as an expert on the effects of heroin on the body, opiates are not a mind-confusing drug and so long as a person's eyes are open, the person can communicate as the drug does not cause mental confusion.

The story told to Matt was almost identical to the story Taylor told Officer Breshears later that day. Taylor does not assert any *Miranda* error regarding *that* interview. The only real difference between the interviews was a statement in the second interview about the type of heroin.

The mere ingestion of drugs and alcohol does not compel the conclusion that a defendant is incapable of intelligently waiving his rights. (*People* v. *Watson* (1977) 75 Cal.App.3d 384, 397 [142 Cal.Rptr. 134]; *People* v. *Moore* (1971) 20 Cal.App.3d 444, 449-450 [97 Cal.Rptr. 601]; *People* v. *Conrad* (1973) 31 Cal.App.3d 308, 319-321 [107 Cal. Rptr. 421].)

Although Taylor was heavily under the influence of heroin Matt testified that Taylor never appeared confused and answered directly, coherently and in detail. There was no evidence to refute Matt's testi-

mony that Taylor could communicate so long as his eyes were open and that opium is not a mind-confusing drug.

We have independently examined the entire record to ascertain whether Taylor's statements were voluntary (*People* v. *McClary* (1977) 20 Cal.3d 218, 227 [142 Cal.Rptr. 163, 571 P.2d 620]). Taking into account all of the circumstances surrounding the statements, we conclude that the statements were voluntary.

Furthermore, the statements were admissions and not a confession. An admission is deemed prejudicial unless its introduction is shown to be harmless beyond a reasonable doubt (*id.*, at p. 230). We conclude that even assuming error took place, reversal on that ground is not compelled because the statement obtained by Matt was substantially identical to that which was obtained in a subsequent interview made in full compliance with *Miranda*.

## SUICIDE

During the trial Taylor sought to introduce evidence that Clarke committed suicide by overdosing. Pursuant to Evidence Code section 352, the court excluded this evidence but did instruct the jury on intervening cause (CALJIC No. 8.57), negligence (CALJIC No. 8.91) and willful misconduct (CALJIC No. 8.31).

At the evidentiary hearing Taylor called Peek and Leah Ruby Fine (Fine), two close friends of Taylor.

Peek testified that on several occasions Clarke said that he did not want to live any longer because he had Ryder's Syndrome and was in lots of pain, he had lost his wife and he did not have anything going for him. Peek remembered that these statements were made two months and four months before Clarke's death.

Clarke had a drinking problem inasmuch as every time Peek saw Clarke, Clarke was drinking. During the last six months of Clarke's life Peek saw Clarke approximately twice a week. Clarke was drinking on both occasions when he made the "end it all" statements.

Fine testified that she had grown up with Clarke and saw him frequently (almost every day) for approximately three months before his death and the last time she saw him was three weeks before his death.

For about a year prior to his death he mentioned that he had nothing to live for but he talked about this more and more in the last three or four months he lived. During this time he was using heroin, and had been for approximately two years. Sometimes, Clarke broke down in tears and said he was dying anyway, when Fine spoke with Clarke about his feelings on taking his own life. Also Clarke was depressed about the fact that he did not see his friends except when he received a check once a month.

Approximately three weeks before Clarke's death Fine visited Clarke at his residence in the morning. Clarke stated several times that he was not concerned with the medication that was supposed to control his disease.

He was depressed that morning because of his health, his poor living conditions and the fact that his wife had left him. Then he expressed that he was tired of living. This discussion occurred early in the day and he was not intoxicated as he had drunk two or three beers that morning.

Approximately two hours after his expression about being tired of living Clarke appeared in a better mood as he was going to obtain some heroin.

Fine also testified that Clarke had used the word suicide a couple of times but she was unclear whether Clarke had said that he would actually kill himself. However, Clarke did say three months before his death that "he was tired of living the way he had to live. He said he wished he had enough money to buy enough heroin so he could do it all in one thing."

The trial court ruled that any probative value of the statements was outweighed by the undue consumption of time presentation of the evidence would involve and stated "If we have this type of evidence admitted, I think we'll have the door open to untold amounts of evidence relating to his ups and downs, depressions and what have you, and I think it should be excluded under 352." Counsel for Taylor contends that exclusion of this evidence was reversible error. We agree.

The trial court has wide discretion in rejecting evidence pursuant to Evidence Code section 352 (*People v. Wein* (1977) 69 Cal.App.3d 79, 90 [137 Cal.Rptr. 814]). However, as the court said in *People v.*

*Reeder* (1978) 82 Cal.App.3d 543, 553 [147 Cal.Rptr. 275]: "Evidence Code section 352 must bow to the due process right of a defendant to a fair trial and to his right to present all relevant evidence of *significant* probative value to his defense." (Italics in original.)

■ Respondent's assertion to the contrary notwithstanding we believe that the statements were suicide declarations. This evidence was clearly relevant evidence under Evidence Code section 1250 to show state of mind (see Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 1972) § 14.2) and, in any event, was intrinsically highly reliable evidence satisfying the policy of the hearsay rule.

In *People* v. *Salcido* (1966) 246 Cal.App.2d 450 [54 Cal.Rptr. 820], this court held that evidence of earlier suicide attempts by the victim (one of which was 10 months before the victim's death) should have been admitted in a murder case (*id.*, at pp. 461-462). The court held that the evidence was relevant and not too remote (*id.*, at p. 460). Moreover, the court rejected the People's argument that the victim was happy on the date in question, thereby making the evidence of prior suicide attempts irrelevant. "Respondent's argument loses sight of the fact that in a murder case it is the victim's inclination or propensity to commit suicide under emotional stress that is relevant and that any competent evidence which logically and reasonably tends to show this is admissible unless objectionable under some other rule of exclusion. It is true that the trial judge has wide discretion on the question of remoteness, but this discretion is not without limitation." (*Id.*, at pp. 459-460.)

The case law in California is clear that suicide statements are admissible (in addition to *Salcido, supra*, see *People* v. *Matlock* (1959) 51 Cal.2d 682 [336 P.2d 505]; *People* v. *Parriera* (1965) 237 Cal.App.2d 275 [46 Cal.Rptr. 835]; *People* v. *Tugwell* (1915) 28 Cal.App. 348 [152 P. 740]; *People* v. *Wilson* (1910) 14 Cal.App. 515 [112 P. 579]; Witkin, Cal. Evidence (2d ed. 1966) § 567).

Any competent evidence tending to show that the deceased came to his death by his own act is admissible (40 C.J.S., Homicide, § 217, p. 1129). Once, as here, the data as suicide are sufficient to be considered, then the declarations of the deceased are a proper mode of proof (6 Wigmore, Evidence (Chadbourn rev. ed. 1976) §§ 1725 and 1726). The few rulings which have excluded declarations of intention to commit suicide are without foundation in principle (*ibid.*, § 1726).

The statements by Clarke were not remote. While there was no evidence that Clarke said on the night in question that he was going to then kill himself, there was ample evidence that statements were made by Clarke ranging from four months to three weeks before his death regarding suicide. He stated that he no longer wanted to live and wished he had enough money to buy sufficient heroin to overdose. This is not a case of more corollary evidence or highly speculative evidence (such as existed in *People* v. *Thompson* (1961) 193 Cal.App.2d 620 [14 Cal.Rptr. 512]). The fact that Clarke did not take all of the available heroin (Cantwell having taken one-half thereof), only goes to rebuttal evidence and does not make the proffered evidence inadmissible (on rebuttal evidence re suicide see *People* v. *Selby* (1926) 198 Cal. 426, 430 [245 P. 426]). As Wigmore said: "There ought to be no doubt about the admissibility of *plans or desires to commit suicide*, even where no other evidence of its particular probability or feasibility is offered. Its improbability or nonfeasibility should be matter for rebuttal, and should not exclude the evidence of its probability." (1 Wigmore, Evidence (3d ed. 1940) § 143, p. 579.) Here, the evidence does not reveal that Clarke was severely depressed only infrequently or on isolated occasions. Rather, the evidence showed that in the months prior to his death, Clarke was a very emotionally disturbed individual who indicated to his close friends that he embraced suicide as an option.

Admission of the proffered evidence would not necessitate undue consumption of time, confuse the issues or mislead the jury. Approximately 25 pages of transcript in the instant case are devoted to the evidentiary hearing and that included approximately 10 pages of voir dire. Any additional proceedings including rebuttal could have been carefully controlled without the necessity of rejecting and totally excluding the evidence.

Furthermore, the right of a defendant to present evidence in his defense is so fundamental that consumption of time is irrelevant where the evidence is not cumulative (*People* v. *Mayfield* (1972) 23 Cal.App.3d 236, 243 [100 Cal.Rptr. 104]). A defendant has a fundamental right to present evidence in his own behalf (*Davis* v. *Alaska* (1974) 415 U.S. 308 [39 L.Ed.2d 347, 94 S.Ct. 1105]).

Additionally, we agree with defense counsel that rather than being misleading to the jury, the evidence here "would have given sense to and clarified the instruction on intervening cause." The district attorney

in argument to the jury referred to the contention of suicide as being ludicrous and invited the jurors to go back through the evidence where they would find no evidence that Clarke committed suicide. This argument would certainly not have been so telling if the proffered evidence had been admitted.

The failure to admit this evidence was prejudicial and the error requires reversal. Simply stated the rejection of the evidence deprived Taylor of the presentation of a causation defense. The evidence re suicide should be admitted leaving to the jury the determination of the matter upon the evidence submitted.

### SENTENCING AND CREDITS

Although reversal is required on the felony-murder conviction, we note that the sentence on the Health and Safety Code section 11352 charge was stayed pending service of the sentence on the murder charge. Consequently, a few comments are appropriate on sentencing and credits. ■ Taylor contends that the trial court failed to comply with Penal Code section 1170, subdivision (c), and the California Rules of Court requiring statement of reasons for a sentence choice in that the court failed to state reasons for denial of a diagnostic referral. Not so. First, a diagnostic referral is not a "sentence choice" under California Rules of Court, rule 405 (f). The purpose of a diagnostic referral is to assist in determining the ultimate disposition and is not the disposition. Second, even if it be a sentence choice, the rules do not require the giving of reasons explaining why possible dispositions were rejected (com. of Advisory Committee to Cal. Rules of Court, rule 443; see *People* v. *Butler* (1980) 107 Cal.App.3d 251 [165 Cal.Rptr. 709]). The trial judge stated his reasons in this case for imposing a prison sentence. There was no sentencing error.

■ Taylor contends that he is entitled to additional good-time/work-time credit for presentence custody. The Supreme Court decision in *People* v. *Sage* (1980) 26 Cal.3d 498 [165 Cal.Rptr. 280, 611 P.2d 874], holds that equal protection compels such conduct credits. Under the circumstances the Department of Corrections should, upon application by Taylor, administratively determine such credits, if any.

The error requiring reversal applies only to the felony-murder charge. Conviction on the furnishing charge (Health & Saf. Code, § 11352) should be affirmed.

The judgment of conviction of violation of Health and Safety Code section 11352 is affirmed. The Department of Corrections is directed to determine the presentence conduct credits, if any, to which appellant is entitled upon appellant's application for administrative determination of such credits.

The judgment of conviction of second degree felony murder is reversed and the matter remanded for further proceedings in accordance with the views expressed herein.

Brown (G. A.), P. J., and Andreen, J., concurred.

A petition for a rehearing was denied December 19, 1980, and respondent's petition for a hearing by the Supreme Court was denied February 5, 1981. Mosk, J., and Clark, J., were of the opinion that the petition should be granted.